NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12112


ERIC N. BALLES  vs.  BABCOCK POWER INC.



Middlesex.      November 8, 2016. - March 6, 2017.

Present:  Gants, C.J., Botsford, Lenk, Hines, Gaziano, Lowy, &
Budd, JJ.



Executive.  Employment, Termination.  Corporation, Stockholder,
    Close corporation, Liability of officers.  Contract,
    Employment, Performance and breach.  Fiduciary.



Civil action commenced in the Superior Court Department on
December 21, 2010.

The case was heard by Douglas H. Wilkins, J.

The Supreme Judicial Court granted an application for
direct appellate review.


Mark C. Fleming (Jonathan A. Cox also present) for the
defendant.
Thomas J. Carey, Jr. (Jody L. Newman also present) for the
plaintiff.
Ben Robbins & Martin J. Newhouse, for New England Legal
Foundation, amicus curiae, submitted a brief.


LENK, J.  The dispute before us chiefly concerns the

meaning and application of the stockholders' agreement between a

company, Babcock Power Inc. (Babcock or company), and its former executive, Eric N. Balles. To a lesser extent, it also concerns the separate employment agreement between the two.

Babcock terminated Balles's employment when it discovered that he was engaged in an ongoing extramarital affair with a young female subordinate. Babcock's board of directors (board) subsequently concluded that Balles had been terminated "for cause" under the terms of his stockholders' agreement with the company, thereby allowing the board to repurchase his stock at a minimal price. The board withheld subsequent dividends, amounting to approximately $900,000 in total, and refused to pay Balles any severance.

Years of litigation followed, with Balles seeking declaratory relief to the effect that the stock be returned to him, along with the withheld dividends. Babcock responded with counterclaims on various grounds. Following a bifurcated trial, a Superior Court jury rejected Babcock's counterclaims, and although Balles prevailed at a jury-waived trial on his claim for declaratory relief, a portion of his prior salary was subjected to equitable forfeiture and he was unsuccessful in his bid to receive severance pay. Babcock appealed from the

judgment at the jury-waived trial, and we allowed its application for direct appellate review.  We affirm.[1]

1.  Background.  We recite the facts found by the trial judge, which the parties acknowledged at oral argument they do not challenge.  We have supplemented those findings by reference to facts in the record that the parties do not dispute.

a.  Stockholders' agreement and employment agreement.  When his employment at Babcock began in 2002,[2] Balles entered into two agreements:  a stockholders' agreement and an employment agreement.[3]  Under the terms of the stockholders' agreement, Balles, one of seventeen "management investors" in Babcock,[4] received 100,000 shares of common stock in the company at a price of $0.001 per share.

Section 5 of the stockholders' agreement sets forth the rights of management investors in the event of their

---

[1] We acknowledge the amicus brief submitted by New England Legal Foundation in support of the defendant.

[2] Balles joined the conglomerate that would become Babcock Power Inc. (Babcock or company) in 2001, when he became the senior vice-president of technology development for Babcock Borsig Power, Inc. (Borsig).  In 2002, Borsig combined with several other affiliated companies to form a new entity, Babcock.

[3] At all times relevant to this dispute, prior to his termination, Balles served as an executive of various subsidiaries of Babcock.

[4] Balles entered into the stockholders' agreement partially in consideration for relinquishing his rights in Borsig.

termination. Section 5(d) states that, if a management investor's employment is terminated without cause, the stockholders' agreement continues to apply to his or her stock. By contrast, section 5(e) provides that if a management investor's employment is terminated "for cause," as defined in the stockholders' agreement, Babcock's board of directors must repurchase his or her stock at the nominal price of $0.001 per share.

"Cause," in turn, is defined under section 1 of the stockholder's agreement as follows:

"(a) fraud, embezzlement or gross insubordination on the part of the Management Investor; (b) the Management Investor's conviction of or plea of nolo contendere to any felony; (c) the Management Investor's willful and material breach of or willful failure or refusal to perform and discharge, his duties, responsibilities or obligations to the Company (other than by reason of disability or death) that is not corrected within thirty (30) days following written notice thereof to the Management Investor by the Company, such notice to state with specificity the nature of the breach, failure or refusal; provided, that if such breach, failure or refusal cannot reasonably be corrected within thirty (30) days of written notice thereof, such thirty (30) day period shall be extended for so long as may be reasonably necessary to correct the same; or (d) any act of willful misconduct by the Management Investor which (i) is intended to result in substantial personal enrichment of the Management Investor at the expense of the Company or any of its subsidiaries or affiliates or (ii) is intended to and does have a material adverse impact on the business or reputation of the Company or any of its subsidiaries or affiliates. For purposes of this Agreement, a determination of 'Cause' may only be made by the Board of Directors of the Company."

The stockholders' agreement also provides for a jury-waived trial to adjudicate any claims arising under it, stating in relevant part that "each party acknowledges and agrees that any controversy which may arise under [the stockholders' agreement] is likely to involve complicated and difficult issues," and that the parties "waive[] any right such party may have to a trial by jury in respect of any litigation directly or indirectly arising out of or relating to the [stockholders' agreement]."

The employment agreement between Balles and Babcock provided that he would serve as an employee "at will" and could be terminated at any time for any reason. The employment agreement also stated that, in the event of Balles's termination, he would be entitled to severance pay unless he was terminated for cause, "as defined in [the] [s]tockholders' [a]greement."

b. <u>Relationship with female subordinate</u>. The female subordinate began working at Babcock as an intern when she was still an undergraduate student. She eventually obtained a full-time position at the company as an "Engineering Management Assistant/Engineering Coordinator." After receiving two raises while serving in this role, she eventually was promoted to the position of "Operations Associate/Engineering." Balles was her supervisor at all relevant times.

In the summer of 2008, Balles began an intimate extramarital relationship with the female subordinate, which continued through his termination in 2010. The pair pursued their relationship on business trips funded by Babcock, and exchanged sexually explicit text messages on their personal cellular telephones. Balles uploaded, downloaded, and saved photographs of the female subordinate, some depicting sexual content, on his Babcock-issued laptop computer.[5] To conceal his relationship with the female subordinate from Babcock, Balles falsified the details of at least one travel reimbursement request, but did not intentionally claim any fiscal reimbursement from Babcock to which he was not entitled under company policy.[6]

On August 30, 2010, Michael LeClair, the president and chief executive officer of Babcock, learned of the relationship between Balles and the female subordinate. Soon thereafter, Jim Dougherty, president and chief executive officer of a subsidiary of Babcock, hand-delivered a memorandum to Balles stating that

---

[5] Balles gave several conflicting explanations as to how the photographs of the female subordinate ended up on his Babcock-issued laptop computer, none of which was credited by the trial judge.

[6] The trial judge found that Balles did not intentionally deprive Babcock of any funds during his relationship with the female subordinate. He did find, however, that Balles apparently inadvertently requested $316.43 in reimbursements to which he was not entitled.

his employment was suspended "pending an investigation into allegations of misconduct and improper workplace behavior relating to [his] relationship with a female subordinate employee."  Babcock's investigation included an in-depth review of Balles's documents, text messages, and electronic mail messages, all of which were stored on his company-issued computer.  The investigation disclosed more than one hundred photographs and thousands of text messages between Balles and the female subordinate.  Several of the messages described executives, as well as Balles's "negative feelings about working for [Babcock] and about his superiors."  LeClair came to the conclusion that "Balles failed to perform his job from the moment" that he began his affair with the female subordinate.

During the investigation, Balles repeatedly requested a face-to-face meeting with the board, which Babcock declined to provide.  He received a letter on September 15, 2010, informing him that his employment had been terminated effective September 1, 2010, and that the board would be meeting shortly to determine whether his conduct met the definition of "[c]ause" under the stockholders' agreement.  Babcock's attorney sent notice separately that it would not be necessary for Balles to provide information relating to the allegations of misconduct

against him.  The parties engaged in settlement negotiations but were unable to come to an agreement.[7]

At the subsequent board meeting to determine whether Balles's conduct constituted "cause" within the meaning of the stockholders' agreement, LeClair summarized the investigation and recommended that the board terminate Balles "for cause" pursuant to clauses (a), (c), and (d) of the definition of "[c]ause" in section 1 of the stockholders' agreement.  The board, after discussion, unanimously agreed, as noted in its minutes, that Balles's conduct constituted "cause" under the stockholders' agreement.  The minutes reflected the board's determination that there was "overwhelming and irrefutable evidence that . . . Balles engaged in serious misconduct during his employment and [that] such misconduct was a breach of fiduciary duty to the [c]ompany, including a breach of his duty of loyalty."  Because the board terminated Balles for cause, it went on to "repurchase" all of Balles's shares pursuant to section 5(e) of the stockholders' agreement, "amounting to 100,000 shares of capital stock of [Babcock] for a repurchase price of $0.001 per share."

c.  Prior proceedings.  Shortly after the board voted to terminate him "for cause," Balles commenced this action against

---

[7] Balles's settlement offer included a forfeiture of $500,000 in dividends and a limited noncompete agreement.  The board summarily rejected this offer.

Babcock in the Superior Court. He sought a declaratory judgment invalidating the board's repurchase of his shares under the stockholders' agreement and alleged that the board had committed a breach of the agreement by denying him subsequent dividend payments. He also asserted that the company had committed a breach of his employment agreement by declining to pay him severance upon his termination. The company denied the allegations and asserted seven counterclaims.[8] The proceedings in the Superior Court were bifurcated into a jury trial to adjudicate the majority of Babcock's counterclaims, and a jury-waived trial to resolve Balles's declaratory judgment and contract claims, along with Babcock's counterclaim asserting a breach of fiduciary duty and the duties of loyalty and good faith.[9]

The jury found for Balles on Babcock's counterclaims. The trial judge, moreover, ruled in favor of Balles on the declaratory judgment and breach of contract claims, concluding

---

[8] The counterclaims included "breach of fiduciary duty and the duties of loyalty and good faith," which the company alleged arose from Balles's occupation of "a position of trust and confidence at [Babcock]"; waste of corporate assets; fraud; misrepresentation; nondisclosure; conversion; and breach of the implied covenant of good faith and fair dealing.

[9] The trial judge referred to this claim as the "equitable forfeiture claim," presumably because Babcock requested the equitable forfeiture of Balles's salary during the period of his affair with the female subordinate on the basis of his alleged breach.

that Balles "was not fired 'for cause' as defined in the [s]tockholders' [a]greement" and that he was therefore "entitled to the return of his stock and payment of all dividends and other benefits provided by Babcock . . . as if he had own[ed] the stock continuously." The judge found in favor of Babcock on its remaining counterclaim, concluding that Balles had committed a breach of his fiduciary duty of loyalty to the company, owed pursuant to his status as an employee. On this basis, the judge assessed Balles $412,000 in equitable forfeiture of his past salary. The judge also rejected Balles's claim for severance pay under the employment agreement, on the ground that Balles had committed a material breach of the agreement through his disloyal actions.

Babcock appealed from the judgment, raising issues arising only from the jury-waived trial, and we allowed its application for direct appellate review.[10]

2. Discussion. Babcock advances three arguments on appeal. First, it contends that the trial judge should have accorded deference to the board's decision and reviewed it only to ascertain whether it was arbitrary, capricious, or made in

---

[10] Balles did not appeal from the denial of his claim for severance under the employment agreement, or from the allowance of Babcock's breach of fiduciary duty claim resulting in the equitable forfeiture of his salary.

bad faith.[11]  Second, it argues that the judge erred in determining that Balles's conduct did not constitute "cause" under clauses (a) and (c) of the definition of that term in section 1 of the stockholders' agreement.  Third, it maintains that Balles committed a material breach of the stockholders' agreement and therefore cannot recover under it.  We address each argument in turn.

a.  Appropriate standard of review.  Babcock argues that the trial judge improperly reviewed on a de novo basis the board's determinations of "cause."  The company relies in this regard on the last sentence of the "[c]ause" definition in section 1 of the stockholders' agreement, which provides that "[f]or purposes of this [a]greement, a determination of '[c]ause' may only be made by the [board]."  Babcock contends that this language demonstrates the parties' intent that the board's determinations under the "cause" provision receive deference upon any judicial review.  We agree with the trial judge that the language of the stockholders' agreement does not support Babcock's suggested interpretation.

---

[11] In order to facilitate appellate review, the trial judge also applied the deferential standard of review to which Babcock argues it is entitled to the board's determination, concluding that the board's decision was "arbitrary and capricious."

We review a court's "interpretation of the meaning of a term in a contract," a question of law, de novo.[12] EventMonitor, Inc. v. Leness, 473 Mass. 540, 549 (2016). In so doing, we are mindful that when the language of a contract is clear, it alone determines the contract's meaning, but that a court may consider extrinsic evidence if the language is ambiguous. Id. The determination of ambiguity in a contract is also a question of law. Eigerman v. Putnam Invs., Inc., 450 Mass. 281, 287 (2007). Contractual language is ambiguous when it "can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken" (citation omitted). Bank v. Thermo Elemental Inc., 451 Mass. 638, 648 (2008). When contract language is unambiguous, it must be construed according to its plain meaning. General Convention of the New Jerusalem in the U.S. of Am., Inc. v. MacKenzie, 449 Mass. 832, 835 (2007).

To determine whether the language at issue is ambiguous, we look both to the contested language and to the text of the contract as a whole. Assuming without deciding that parties to a private agreement may contract for a specific standard of

---

[12] The interpretation of a contract constitutes "a question of law for the court" (citation omitted). See Freelander v. G. & K. Realty Corp., 357 Mass. 512, 516. Accordingly, a court generally will accord no deference to a party's interpretation of a contract but, rather, will focus on the language of the instrument to effectuate its terms. See id.

judicial review in this situation,[13] we conclude that the language at issue is not ambiguous and that it does not provide for a deferential standard of judicial review.

On its face, the contract language that Babcock highlights speaks to which persons in the company are to determine "cause" for purposes of the stockholders' agreement. Standing alone, the sentence is silent as to an appropriate standard of judicial review for disputes relating to that determination. The language does not, by itself, contain an ambiguity that could support Babcock's suggested interpretation. The language also does not convey any ambiguity when read in conjunction with the remainder of clause (c) of the definition of "[c]ause" or the stockholders' agreement as a whole. The only provision dealing with a somewhat related matter is section 9(e)(iii), which provides that "any controversy which may arise under [the stockholders' agreement] is likely to involve complicated and difficult issues, and therefore each . . . party . . . unconditionally waives any right such party may have to a trial

---

[13] Parties to a private agreement have been permitted to contract for a more deferential standard of review in certain instances, see, e.g., Acmat Corp. v. Daniel O'Connell's Sons, Inc., 17 Mass App. Ct. 44, 49 (1983) (contract provision granting architect power to decide all questions of interpretation of contract valid unless decision arbitrary or capricious), but not in others. See, e.g., Patton v. Babson Statistical Org., 259 Mass. 424, 428 (1927) ("It would be a travesty upon all ideas of judicial propriety or of judicial work for a man to be an arbitrator to settle the amount of his own liability" [citation omitted]).

by jury in respect of any litigation directly or indirectly arising [out] of or relating to [the stockholders' agreement] . . . ."  If anything, this recognition of the innate complexity of disputes arising under the contract and of the need for resolution by judges rather than juries is consistent with the application by judges of the usual de novo standard of review.[14]

Concluding, as we do, that the contractual language on which Babcock relies does not provide for judicial deference to the board's determination of "cause," de novo review by the trial judge thus was appropriate.[15]

---

[14] The result is the same if we assume, as the parties apparently do, that the language in question is ambiguous and turn to extrinsic evidence to discern the term's meaning. Because contracting parties' intent is an issue of fact, we defer to the trial judge's findings and review only for clear error.  See Seaco Ins. Co. v. Barbosa, 435 Mass. 772, 779 (2002).  The trial judge concluded that the drafters "intended to protect the property rights of [management investors] through the specific language they chose, as finally construed and applied by a judge or judges."  This determination is supported by the uncontroverted testimony of Dale Miller, a corporate lawyer who negotiated the stockholders' agreement.  He testified that if the board terminated a management investor "for cause" without a "very clear" case, it "could have an adverse unintended consequence of having other founder shareholders . . . walk out the door," thus depriving the company of its "primary asset[s]."

[15] Babcock's reliance on Noonan v. Staples, Inc., 556 F.3d 20 (1st Cir. 2009), does not persuade us to the contrary. Noonan addressed a stock-option agreement providing that "[c]ause" would be "determined by [the company], which determination shall be conclusive."  Id. at 24.  The United States Court of Appeals for the First Circuit resolved that, given such language, judicial review of the company's determination would appropriately be limited to whether it "was

b. <u>Board's decision to terminate Balles for cause under stockholders' agreement</u>. Babcock argues that the trial judge erred in determining that Balles's conduct did not meet clauses (a) and (c) of the definition of "[c]ause" in section 1 of the stockholders' agreement.

i. <u>Clause (a)</u>. Babcock argues that Balles's conduct constituted "fraud" and "gross insubordination" under clause (a) for three reasons: (i) his intentional submission of false expense reports for the purpose of concealing his affair with the female subordinate was fraudulent; (ii) his outspoken support for the female subordinate constituted fraud because she lacked fitness for employment; (iii) his over-all conduct during his relationship with the female subordinate constituted gross insubordination. We discern no error in the judge's determination that Balles's conduct did not constitute fraud or gross insubordination.

A. <u>Fraud</u>. The elements of fraud consist of "[1] a false representation [2] of a matter of material fact [3] with knowledge of its falsity [4] for the purpose of inducing

_____

arbitrary, capricious, or made in bad faith." <u>Id.</u> at 33. Babcock attempts to liken the language at issue to that in <u>Noonan</u> and urges that it similarly represents the parties' intent to provide the board with deferential review. The <u>Noonan</u> contract, however, provided that the company's judgment "<u>shall be conclusive</u>" (emphasis added). <u>Id.</u> at 24. The language here, in contrast, merely provides that only the board is authorized to find cause in the first instance.

[action] thereon, and [5] that the plaintiff relied upon the representation as true and acted upon it to his [or her] damage." Danca v. Taunton Sav. Bank, 385 Mass. 1, 8 (1982), quoting Barrett Assocs. v. Aronson, 346 Mass. 150, 152 (1963).[16]

I. False reimbursement requests. The trial judge found that Balles's false reimbursement requests had not resulted in damage to Babcock, and that Balles lacked fraudulent intent, both necessary elements of fraud. Because Babcock has failed to show that the judge's findings, amply supported by the evidence, were clearly erroneous, it cannot establish that Balles's submission of false reimbursement requests gave rise to fraud that would constitute cause under clause (a) of the definition of "[c]ause" in the stockholders' agreement.

II. Advocacy for the female subordinate. Babcock similarly maintains, again without merit, that in view of the female subordinate's inadequate qualifications and poor job performance, it was fraudulent conduct on Balles's part to advocate -- as her supervisor and without disclosing their personal ties -- on her behalf professionally. The judge, however, determined that "[t]he jury, the court, or both, have rejected the factual claim that Balles was engaged in any ruse when he made decisions about [the female subordinate's]

_____

[16] Both parties accept that, as the trial judge determined, the definition of "fraud" under the stockholders' agreement mirrors the concept of fraud in our common law.

employment, [and] her salary and benefits," and that "[a]ll of those decisions had a sound business justification." He found in this regard that given "the actual work [the female subordinate] did, in combination with her obvious verbal and managerial skills, intelligence, maturity and motivation, . . . [the female subordinate] fully earned her salary, benefits, and tuition reimbursement during the period she was employed at [Babcock]."

To demonstrate that the female subordinate's qualifications and performance were inadequate, the company points to a statement from a coworker suggesting that she had received preferential treatment and a statement from a manager that she lacked an engineering degree. These two statements, however, do not suffice to establish that the trial judge's findings of fact to the contrary, supported by other evidence, were clearly erroneous. See Weiler v. PortfolioScope, Inc., 469 Mass. 75, 81 (2014). Given this, Balles's advocacy on the female subordinate's behalf neither constituted a "false" representation nor resulted in damages to Babcock, and accordingly was not fraudulent.

B. Gross insubordination. Babcock maintains that Balles's conduct also constituted "gross insubordination" under clause (a) because he violated various company policies during his affair with the female subordinate. The trial judge, however,

interpreted the term "gross insubordination" to mean "more than just breaking generally applicable rules." He instead took it to mean the defiance of authority "such as [the violation of] a direct order . . . or disrespect directed to a supervisor personally." The judge found that Balles's conduct did not fall within this definition, noting that "there is no credible evidence of a direct order to Balles to do anything he failed to do," and that he did not "act disrespectfully to his superiors in person."

We defer to the judge's factual findings, but review de novo his interpretation of "gross insubordination" under the stockholders' agreement. Because the stockholders' agreement does not define "gross insubordination," it is appropriate to look to other sources to determine the meaning of the term. See Meehan v. Shaughnessy, 404 Mass. 419, 445 n.22 (1989) (professional norms can supply meaningful definition of contractual term); Zeo v. Loomis, 246 Mass. 366, 368 (1923) ("[Contract term] must be determined from all the circumstances according to the reasonable inferences presumably entertained by normal business [people]").

Babcock relies chiefly on Oehme v. Whittemore-Wright Co., 279 Mass. 558, 563 (1932), which defines "insubordination" as "a wilful disregard of express or implied directions and refusal to obey reasonable orders." The company emphasizes the "implied

directions" portion of the definition, presumably to suggest that Balles's violations of company policy constituted gross insubordination. It is "gross insubordination," and not "insubordination," that gives rise to "[c]ause" under clause (a), however, and Oehme does not speak to the more egregious misconduct required to establish gross insubordination.[17] A review of relevant case law indicates, as the judge concluded, that gross insubordination is generally defined as wilful disregard of a direct order. See Hawkins v. Director of the Div. of Employment Sec., 392 Mass. 305, 306-307 (1984) (affirming review examiner's finding that twice refusing to comply with reasonable and legitimate requests by supervisor constituted "gross insubordination"); Stone v. Omaha, 229 Neb. 10, 13-14 (1988) (employee's refusal to follow orders constituted gross insubordination). Given the judge's uncontested factual finding that Balles never disobeyed a direct order, his conduct did not constitute gross insubordination.

_____

[17] Moreover, clause (c) provides that a management investor's "willful and material breach of, or willful failure or refusal to perform and discharge, his duties, responsibilities or obligations to the [c]ompany" constitutes a predicate for "cause." Construing "gross insubordination" under clause (a) in the manner that Babcock advocates, i.e., as coterminous with the conduct outlined in clause (c), would render the latter section impermissibly superfluous. See Tupper v. Hancock, 319 Mass. 105, 109 (1946) ("It is a canon of construction that every word and phrase of an instrument is if possible to be given meaning, and none is to be rejected as surplusage if any other course is rationally possible" [citation omitted]).

ii. <u>Clause (c)</u>. Babcock also maintains that Balles's conduct fell within clause (c), which defines "[c]ause" as follows:

> "the . . . willful and material breach of, or willful failure or refusal to perform and discharge, his duties, responsibilities or obligations to the [c]ompany . . . that is not corrected within thirty (30) days following written notice thereof to the [m]anagement [i]nvestor by the [c]ompany, such notice to state with specificity the nature of the breach, failure or refusal; provided, that if such breach, failure or refusal cannot reasonably be corrected within thirty (30) days of written notice thereof, such thirty (30) day period shall be extended for so long as may be reasonably necessary to correct the same."

Babcock argues that Balles's relationship with the female subordinate and his attempts to conceal it constituted a wilful and material breach of his obligation of loyalty to the company. Balles concedes that his conduct constituted a breach of loyalty under clause (c), but argues that Babcock failed to provide him with an opportunity to correct his breach, as required by clause (c). The company counters that, because Balles's breach could not be corrected, it was excused from the requirement of offering him an opportunity to correct the breach, as to do so would have been futile.

The trial judge concluded that Babcock had failed to provide Balles with an opportunity to correct his breach in violation of clause (c) and that Balles's conduct was correctable. On appeal, Babcock argues that three particular

components of Balles's breach were uncorrectable:[18] (1) the effect of Balles's divided loyalty on his job performance during his affair with the female subordinate; (2) the harmful effects of Balles's example on company culture; and (3) the risk of a sexual harassment lawsuit caused by Balles's conduct.

We begin by noting that the futility exception upon which Babcock relies is not expressly mentioned in the stockholders' agreement. Both parties nonetheless seem to accept the contention that truly futile gestures under the agreement are unnecessary, an assumption that accords with our common law. To excuse nonperformance in that respect, parties in breach of a contract may establish that compliance with the contract would have been futile. See Shawmut-Canton LLC v. Great Spring Waters of Am., Inc., 62 Mass. App. Ct. 330, 340 (2004). The exception, notably, is quite narrow, see Jefferson Ins. Co. of N.Y. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 42 Mass. App. Ct. 94, 103 (1997) (rejecting interpretation of contract that "would have the exclusion swallow the policy" [citation omitted]), and the party in breach bears the burden of proving that its performance under the contract would have been futile. See, e.g., 7-Eleven, Inc. v. Khan, 977 F. Supp. 2d 214, 230-231 (2013) (party claiming that incurable breach relieved obligation

---

[18] We accept for the sake of argument the company's apparent assumption that, if any one aspect of Balles's breach is uncorrectable, the breach itself is uncorrectable.

to provide notice and opportunity to cure bore burden of proof). Ordinarily, futility is shown where performance under the contract would be impossible, see, e.g., L.K. Comstock & Co. v. United Engineers & Constructors Inc., 880 F.2d 219, 231-232 (9th Cir. 1989) (finding contractually guaranteed opportunity to cure would have been futile where party could not have cured its breaches in allotted time period), or where the other party had first repudiated performance under the contract, see, e.g., Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1009 (1991) (burden on party claiming incurable breach), neither of which took place here.

We nonetheless turn to Babcock's contention that, because Balles's breach cannot be corrected, its failure to provide him with an opportunity to do so falls within the narrow futility exception. Babcock first contends that Balles's breach of loyalty throughout his affair with the female subordinate could not be corrected because the correction provision "contemplates correction of the 'breach' itself -- not its future consequences." In the company's view, "'[c]orrection' presumes that the wrong has been righted, as though no breach happened," and a "'correctable' offense would have been one where, following a 'correction,' Babcock and Balles could have continued their association as before." We are unpersuaded by this argument, both because it relies on an implausible

interpretation of the contract and because Babcock has not shown that Balles's breach was intrinsically incapable of correction.

By asserting that correction requires actually undoing the breach, rather than remedying its effects, Babcock would in effect read the correction provision out of clause (c).  See J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 795 (1986) ("A contract is to be construed to give reasonable effect to each of its provisions").  As a practical matter, bells cannot be unrung, nor the past undone.  Clause (c) contemplates that, in the event of a management investor's "willful and material breach of . . . duties, responsibilities or obligations to the [c]ompany," the management investor will be given thirty days following written notice to "correct" that "breach, failure or refusal [to perform]."  No exception is made for breaches of loyalty.  The correction envisioned, reasonably construed within the context of that clause and the contract as a whole, can only be to remedy the adverse effects from the breach or nonperformance when performance will not itself be adequate or possible.  See Downer & Co. v. STI Holding, Inc., 76 Mass. App. Ct. 786, 792 (2010) (objective in interpreting contract "is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose" [citation omitted]).

Given the foregoing, Babcock has not met its burden of showing that the adverse effects of the breach were uncorrectable if Balles were given the opportunity to do so. Indeed, Babcock prevailed on its counterclaim when the judge deducted over $400,000 from the amount of Balles's salary because of his breach of the duty of loyalty during his relationship with the female subordinate, thereby in essence compensating Babcock for the lost value of Balles's services in that period.

Babcock's contention that Balles's harm to company culture was uncorrectable meets a similar fate. While the trial judge did not address this argument directly,[19] Babcock does not establish why any such harms would not be remedied by the termination of Balles. The company's abrupt termination of Balles, a senior executive, surely made clear to other employees that his impermissible conduct would not be tolerated. The company's lone argument why this would not suffice is its insistence that only terminating Balles for cause could correct the harms he visited upon company values. This argument is at best circular, for if only terminating a management investor for cause adequately can correct his or her harm to company culture,

---

[19] The record does not disclose whether the argument was raised below. Any potential waiver issues are immaterial, however, given our disposition of the issue.

the correction provision itself would be for naught.  See Jefferson Ins. Co. of N.Y., 42 Mass. App. Ct. at 103.

Babcock's final argument -- that the risk of a sexual harassment lawsuit brought by the female subordinate constituted uncorrectable harm to the corporation -- also lacks merit.  The trial judge summarily dismissed this argument, determining that the stockholders' agreement pertains to "actual harm, not potential harm that never materialized."  Even if the judge were incorrect in this and we were to assume that Balles's conduct in fact created a risk to the company that would not otherwise have existed, Babcock has not shown that the harm was uncorrectable.  Risks are routinely adjusted and reallocated by various means such as indemnification agreements providing for the costs of defense, and such measures could presumably have been employed here.[20]  We accordingly reject Babcock's view that the risk of a sexual harassment claim brought by the female subordinate was uncorrectable.[21]

---

[20] As it stands, Babcock does not suggest that it engaged in any preparation for litigation or incurred any defense costs.

[21] Although the trial judge did not appear to rely on this particular ground in rejecting Babcock's claim, "[a]n appellate court is free to affirm a ruling on grounds different from those relied on by the motion judge if the correct or preferred basis for affirmance is supported by the record and the findings." Commonwealth. v. Va Meng Joe, 425 Mass. 99, 102 (1997).

There was thus no error in the judge's determination that Babcock's failure to provide Balles with an opportunity to correct his breach prevents a finding of cause under clause (c).

c. Whether Balles committed a material breach of the stockholders' agreement. Babcock argues further that Balles committed a material breach of the stockholders' agreement, thereby precluding the recovery he seeks under it. The company maintains that Balles owed a fiduciary duty of loyalty to it as an officer and shareholder of a closely held corporation,[22] and that, by committing a breach of this duty, he committed a material breach of the stockholders' agreement.

Even if Balles had committed a breach of a fiduciary duty owed to Babcock arising out of the stockholders' agreement, Babcock's argument nonetheless fails as a matter of law. The rights of stockholders arising under a contract, as here, are governed solely by the contract. See Chokel v. Genzyme Corp., 449 Mass. 272, 278 (2007) ("When rights of stockholders arise under a contract . . . the obligations of the parties are determined by reference to contract law, and not by the fiduciary principles that would otherwise govern"); Blank v. Chelmsford Ob/Gyn, P.C., 420 Mass. 404, 408 (1995) ("questions of good faith and loyalty with respect to rights on termination

_____

[22] Babcock appears to argue that this fiduciary duty of loyalty arises directly out of the stockholders' agreement.

or stock purchase do not arise when all the stockholders in advance enter into agreements concerning termination of employment"); Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 598 n.24 (1975) (shareholders of close corporation may contract for "stock purchase arrangements" that would otherwise violate duties of loyalty and good faith to other shareholders if "stockholders give advance consent . . . through . . . a stockholders' agreement."). Contrast Prozinski v. Northeast Real Estate Servs., LLC, 59 Mass. App. Ct. 599, 608-610 (2003) (employee's breach of fiduciary duties to employer could constitute material breach barring recovery under employment agreement).

Sections 1 and 5 of the stockholders' agreement clearly address the rights of management investors as to their company stock holdings in the event of their termination. Section 5(e) provides that a management investor may only be divested of his or her stock if terminated for "cause." Section 1, in turn, sets forth a detailed, carefully crafted definition of "cause." Clause (c) of that definition specifically speaks to a management investor's rights in the event of termination for a material breach, including a breach of the duty of loyalty. Insofar as the stockholders' agreement speaks directly to the rights of a management investor in the event of the material

breach alleged here, Balles is not precluded from seeking relief pursuant to its terms.

<u>Judgment affirmed</u>.