NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-45                                          Appeals Court

         ALAN MACDONALD  vs.  JENZABAR, INC., & others.[1]


                        No. 17-P-45.

         Suffolk.    October 10, 2017. - January 11, 2018.

            Present:  Vuono, Meade, & Kinder, JJ.


Employment, Termination, Severance agreement.  Contract,
     Employment, Severance agreement, Release from liability,
     Performance and breach, Construction of contract.  Release.
     Corporation, Stock.


     Civil action commenced in the Superior Court Department on
August 17, 2012.

     The case was tried before Janet L. Sanders, J., and entry
of judgment was ordered by her.


     Colin R. Hagan for the plaintiff.
     Michael D. Blanchard for the defendants.


     MEADE, J.  Alan MacDonald initiated this action in the

Superior Court against his former employer, Jenzabar, Inc.

(Jenzabar), and four of its directors (directors) after a

dispute arose over his rights to certain Jenzabar preferred

_____

         [1] Robert A. Maginn, Jr.; Ling Chai; Daniel Quinn Mills; and
Joseph San Miguel.

shares and stock options granted during the course of his employment.  Central to that dispute is the interpretation of a severance agreement MacDonald executed as he departed from Jenzabar (severance agreement).  According to Jenzabar and the directors, all of MacDonald's claims should be dismissed because the severance agreement, which contains a general release, is unambiguous and extinguished his rights to the preferred shares and stock options.  MacDonald, in turn, maintains that the severance agreement is ambiguous and that extrinsic evidence, which Jenzabar chose not to dispute, establishes that the parties did not intend to so terminate his rights.  After four years of litigation, both sides prevailed in part.

Most of MacDonald's claims, including all of those against the directors, were dismissed at various stages of the litigation for reasons unrelated to the interpretation of the severance agreement.[2]  As to that central issue, a judge concluded, in rulings issued both prior to and after trial, that

---

[2] Two judges, acting on separate dispositive motions, combined to dismiss MacDonald's claims for interference with contractual and prospective economic relations, conversion, civil conspiracy, violations of both G. L. c. 149, § 148 (Wage Act), and G. L. c. 110A (Massachusetts Uniform Securities Act [MUSA]), and the advancement of attorney's fees by Jenzabar.  One of those judges also rejected, on grounds of futility, MacDonald's request to amend the complaint to add a claim for violation of G. L. c. 93A.  Of these rulings, MacDonald raises on appeal only the dismissal of the Wage Act and MUSA claims and the denial of the motion to add the c. 93A claim.  As none of those claims survives our interpretation of the severance agreement, however, we need not reach those issues.

the severance agreement is unambiguous insofar as it extinguished MacDonald's rights to the preferred shares, but is ambiguous regarding the stock options.[3] After Jenzabar preserved its appeal with respect to the interpretation of the contract and waived the right to argue that any ambiguities should be resolved in its favor, the same judge presided over a jury trial on the limited issue of liability for the stock options. At the conclusion of that trial, the jury returned a verdict finding Jenzabar liable for refusing to honor MacDonald's initial exercise of 1,000 stock options, but not liable for failing to honor his second exercise of the remaining 1,515,000 options.[4] Following trial, therefore, the judge, at MacDonald's request, issued an order of specific performance as to the 1,000 stock options. The verdict and various dispositive rulings were summarized in an "Order and Judgment" entered on August 11, 2016 (judgment). The present cross appeals followed, with the parties alleging error with respect to a number of the rulings issued throughout the litigation.

---

[3] MacDonald and Jenzabar both asserted claims for declaratory judgment with respect to the status of MacDonald's rights to the preferred shares and stock options. The rulings on those competing claims and counterclaims are before us on appeal.

[4] The trial involved MacDonald's claims against Jenzabar for breach of contract and breach of the implied covenant of good faith and fair dealing.

We need reach only one of those issues.  Upon de novo review, we conclude, as a matter of law, that the severance agreement is unambiguous insofar as it extinguished MacDonald's rights to both the preferred shares and stock options.  We therefore affirm in part and reverse in part.

1.  <u>Background</u>.  The following facts are undisputed.  On June 30, 2004, several years into the first of his two terms of employment with Jenzabar, MacDonald, who was then the chief financial officer, executed a written employment agreement (employment agreement).  The employment agreement provided, among other things, for the Jenzabar's issuance of shares of preferred stock (preferred shares) and options to acquire common stock (stock options) to MacDonald.  As to the latter, MacDonald and Jenzabar entered into two additional written agreements, also dated June 30, 2004, wherein Jenzabar issued him options to purchase a total of 1,516,000 shares of its common stock (option agreements).  The stock options vested in equal allotments over a three-year period and, to the extent not exercised, expired in ten years.  Subsequently, in 2007, MacDonald left Jenzabar to pursue other interests.  As of that time, he had neither received the preferred shares nor exercised any of the stock options.

In the latter part of 2008, MacDonald returned to Jenzabar and took a position as mergers and acquisitions researcher.  Six

months later, however, he again left Jenzabar.  At that time, he was offered a package, documented in the severance agreement, whereby Jenzabar agreed, in return for certain consideration, to continue to pay his salary, as well as a portion of his health insurance costs, for six months.  MacDonald accepted and executed the severance agreement on May 26, 2009.  As of that time, he had still not received the preferred shares or exercised any of his stock options.

Three provisions in the severance agreement are of particular significance in this action.  The first is the general release in section 2, which provided, in pertinent part:

> "General Release of Claims.  As a material inducement to the Company to enter into this Agreement, you agree to fully, irrevocably and unconditionally release, acquit and forever discharge the Company, its predecessors, successors, affiliates, parents, subsidiaries, divisions and any other related entities, including, without limitation, . . . all of their current and former agents, officers, employees, directors, representatives, and attorneys, and all persons acting by, through, under, or in concert with any of them (the 'Released Parties') from any and all claims, liabilities, obligations, promises, agreements, damages, causes of action, suits, demands, losses, debts, and expenses (including, without limitation, attorneys' fees and costs) of any nature whatsoever, known or unknown, suspected or unsuspected, arising on or before the date of this Agreement and/or relating to or arising from your employment and your separation from employment with the Company and/or any of the Released Parties, including, without limitation, . . . any and all claims under the Employment Agreement dated as of June 30, 2004 by and between you and Jenzabar . . . .  Without limiting the generality of the foregoing, you agree that the income and benefits provided in this Agreement include and are made in lieu of, and shall be considered as fulfilling, all financial obligations to you, including without limitation,

salary, payroll benefits, bonuses, insurance coverages, <u>fringe benefits</u>, and any amounts payable under any employment separation or severance plan or policy and any other agreement or contract previously entered into by you with any of the Released Parties."  (Emphasis added.)

The second is section 6, which concerns the survival of a confidentiality agreement MacDonald executed upon his return to Jenzabar in 2008 (confidentiality agreement):

> "You hereby acknowledge and affirm the enforceability of the Agreement to Protect Company Assets dated as of October 1, 2008 . . . (the 'Confidentiality Agreement'), which you agreed to as a condition of your employment with the Company.  You agree that such agreement shall remain in full force and effect notwithstanding your termination of employment and also agree that, as an essential term of this agreement, such Confidentiality Agreement shall be amended so that the Noncompete Period of twenty-four (24) months after your termination date and the Nonsolicit Period of twenty-four (24) months after your termination date are amended so that such periods are increased to periods of five (5) years from your termination date. <u>You affirm that this 5-year extension is reasonable in light of</u> (i) your senior role and position with the Company previously as its Chief Financial Officer and as a M&A Research Developer and (ii) <u>the Company's grant to you of a considerable number of options to purchase common stock</u>" (emphasis added).

Finally, the severance agreement contained, in section 7, a merger and integration clause:  "<u>This Agreement</u> constitutes a single, integrated contract expressing the entire agreement between you and the Company and <u>terminates and supersedes all other oral and written agreements or arrangements</u>; provided, however, that you understand and agree that the terms and provisions of the Confidentiality Agreement are specifically

incorporated into this Agreement, and you remain bound by them"
(emphasis added).

Following the execution of the severance agreement,
MacDonald continued to communicate with individuals at Jenzabar
regarding possible ways to convert his preferred shares and
stock options into cash to fund a new business venture.[5] On two
occasions, he also attempted to exercise his stock options,
first seeking to exercise 1,000 options, and then the remaining
1,515,000.[6] Ultimately, however, Jenzabar refused, claiming that
MacDonald released all rights to the preferred shares and stock
options in the severance agreement.

2. Discussion. The interpretation of the severance
agreement, including the determination of ambiguity, is a
question of law for the court, subject on appeal to de novo
review. See, e.g., Balles v. Babcock Power, Inc., 476 Mass.
565, 571 (2017). The rules of interpretation are well-
established. "[A] court generally will accord no deference to a
party's interpretation of a contract but, rather, will focus on
the language of the instrument to effectuate its terms." Id. at
571 n.12.

---

[5] It is these communications that, in large part, make up
the extrinsic evidence MacDonald would rely on if the severance
agreement were held to be ambiguous.

[6] MacDonald's attempt to exercise the 1,515,000 options
occurred several months after he commenced this action.

>"The words of contract must be considered in the context of the entire contract rather than in isolation. When the words of a contract are clear, they must be construed in their usual and ordinary sense, and we do not admit parol evidence to create an ambiguity when the plain language is unambiguous. . . . [E]xtrinsic evidence may be admitted when a contract is ambiguous on its face or as applied to the subject matter. The initial ambiguity must exist, however. Furthermore, extrinsic evidence cannot be used to contradict or change the written terms, but only to remove or to explain the existing uncertainty or ambiguity."

General Convention of the New Jerusalem in the United States of America, Inc. v. MacKenzie, 449 Mass. 832, 835-836 (2007) (citations omitted). See Bank v. Thermo Elemental Inc., 451 Mass. 638, 648 (2008) ("To answer the ambiguity question, the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or intention of the parties"). "[A]n ambiguity is not created simply because a controversy exists between the parties, each favoring an interpretation contrary to the other." Boazova v. Safety Ins. Co., 462 Mass. 346, 351 (2012), quoting from Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). "Language is ambiguous where the phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken." Ferri v. Powell-Ferri, 476 Mass. 651, 654 (2017) (quotation omitted).

We start by considering the language of the general release in section 2 of the severance agreement, which as previously noted provides, in pertinent part, that MacDonald released

Jenzabar "from any and all claims, liabilities, obligations, promises, agreements, damages, causes of action, suits, demands, losses, debts, and expenses . . . of any nature whatsoever, known or unknown, suspected or unsuspected, arising on or before the date of this Agreement." MacDonald's rights to the preferred shares and stock options arise from the prior employment and option agreements. In that regard, the language of the general release is clear and broad. It not only generally extinguishes any and all agreements, of any nature whatsoever, predating the severance agreement, but also expressly extinguishes the employment agreement. Simply put, the plain language of the release is only susceptible of one reasonable interpretation: barring something to the contrary elsewhere in the severance agreement, MacDonald released all rights to the preferred shares and stock options.

According to MacDonald, there is something to the contrary elsewhere in the severance agreement. Specifically, he points to the language in the last sentence of section 6, where he affirmed that the extension of the noncompete and nonsolicitation periods under the confidentiality agreement was "reasonable in light of . . . the Company's grant to you of a considerable number of options to purchase common stock." As MacDonald would have it, this raises an ambiguity regarding

whether his rights to the preferred shares and stock options survived the general release.  For several reasons, we disagree.

First, section 6 of the severance agreement makes reference only to the stock options, not to the preferred shares.  By no means, therefore, is there any ambiguity regarding MacDonald's rights to the preferred shares; those rights were extinguished by the general release.

Second, the language at the end of section 6 does not provide anything to the effect that MacDonald either would continue to retain rights to the stock options or was somehow retaining those rights as consideration for the extension of the noncompete and nonsolicitation periods.  To understand the meaning of the last sentence of section 6, it must be read in its entirety.  The sentence refers not only to MacDonald's stock options, but also to the "senior" roles and positions he held at Jenzabar, as chief financial officer and mergers and acquisitions researcher.  When read as a whole, therefore, the sentence affirms the historical justification for the five-year noncompete and nonsolicitation periods:  namely, that MacDonald had held both high-level positions at, and vested stock option rights in, Jenzabar.

We have a policy in our Commonwealth of giving effect to general releases, even if the parties did not have in mind at the time all of the matters that might be covered.  See Leblanc

v. Friedman, 438 Mass. 592, 598 (2003), quoting from Schuster v. Baskin, 354 Mass. 137, 140 (1968) ("General releases dispose 'of all claims and demands arising out of any transactions between the parties'"); Eck v. Godbout, 444 Mass. 724, 732 (2005) ("[T]he mere fact that a release as worded extends to matters that the parties did not specifically have in mind at the time of execution does not operate to exclude those matters from the scope of the release").  With that in mind, our courts have counselled that any exceptions to, or reservation of rights in, a general release should be stated in clear terms.  See Tupper v. Hancock, 319 Mass. 105, 108 (1946) (any intended exception should have been "expressly" stated); Naukeag Inn, Inc. v. Rideout, 351 Mass. 353, 357 (1966) (same); Schuster v. Baskin, supra at 140-141 (any exceptions should have been "specified").  See also Atlas Tack Corp. v. DiMasi, 37 Mass. App. Ct. 66, 71 (1994) (reservation of rights in release was effective because it was expressed in "very specific language").  If the language in section 6 was intended to create an exception for MacDonald's rights to the preferred shares and stock options, it fell well short of achieving the required level of clarity.

Finally, in section 7, the merger and integration clause, MacDonald and Jenzabar clearly provided that the severance agreement terminated and superseded all other oral and written agreements or arrangements, but for the confidentiality

agreement.  In so doing, they showed that, when they intended to, they knew how to properly craft an exception.  In so doing, they also revealed, by way of omission, that they did not intend to create an exception for the preferred shares and stock options.[7]  The omission is notable given that, as evidenced by section 6, they were cognizant at the time of the stock options.

The severance agreement is unambiguous and extinguished MacDonald's rights to the preferred shares and stock options. Accordingly, none of MacDonald's claims against Jenzabar and the directors can be sustained.

3.  Conclusion.  The judgment is affirmed in part and reversed in part.  The numbered paragraphs of the judgment are amended as follows:

a.  The portion of the judgment set forth in paragraph 1 is reversed;

b.  The substance of paragraph 2 is stricken and replaced with the following:  "On Count Nine of the Third Amended Complaint (declaratory judgment that MacDonald owns 1,516,000 stock options and 250 shares of Series B preferred stock), judgment is entered in favor of Jenzabar in that MacDonald does not own 250 shares of Series B preferred stock and 1,516,000 stock options";

---

[7] MacDonald claims, in the alternative, that the termination of his rights to the preferred shares and stock options was the product of mutual mistake, thereby warranting reformation of the release provision of the severance agreement.  However, the claim is without merit as he has not presented "full, clear, and decisive proof" that the mistake was either mutual or made by him and known to Jenzabar.  Polaroid Corp. v. Travelers Indem. Co., 414 Mass. 747, 756 (1993).  See Caron v. Horace Mann Ins. Co., 46 Mass. 218, 224-225 (2013).

c.  The substance of paragraph 3 is stricken and replaced with the following:  "Judgment is entered in favor of Jenzabar on all Counts of the Second and Third Amended Complaints asserted against it";

d.  The substance of paragraph 9 is stricken and replaced with the following:  "On Count One of Jenzabar's Counterclaims (declaratory judgment that MacDonald released 1,516,000 stock options and 250 shares of Series B preferred stock), judgment is entered in favor of Jenzabar in that MacDonald released all rights that he had to 250 shares of Series B preferred stock and 1,516,000 stock options when he executed the severance agreement."

The judgment is otherwise affirmed.  Given that the award in favor of MacDonald for specific performance as to the 1,000 options for Jenzabar common stock contained in paragraph 1 of the judgment has been reversed, the matter is remanded to the extent that any further orders are necessary to effectuate the unwinding of that award.

<u>So ordered</u>.