NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12070

MICHAEL J. FERRI, trustee,[1] & others[2]  vs.  NANCY POWELL-FERRI
& another.[3]


Suffolk.     November 8, 2016. - March 20, 2017.

Present:  Gants, C.J., Botsford, Lenk, Hines, Gaziano, & Budd,
JJ.[4]


Trust, Assets of trust, Distribution, Irrevocable trust,
     Spendthrift provision.


     Certification of a question of law to the Supreme Judicial
Court by the Connecticut Supreme Court.


     Charles L. Solomont (Nathaniel Bruhn also present) for the
plaintiffs.
     Jeffrey J. Mirman for Paul John Ferri, Jr.

---

[1] Of the Paul John Ferri, Jr., Trust and of the Declaration
of Trust for Paul John Ferri, Jr.

[2] Anthony J. Medaglia, trustee of the Paul John Ferri, Jr.,
Trust and of the Declaration of Trust for Paul John Ferri, Jr.;
and Maurice T. FitzMaurice, trustee of the Declaration of Trust
for Paul John Ferri, Jr.

[3] Paul John Ferri, Jr.

[4] Justice Botsford participated in the deliberation on this
case prior to her retirement.

Kenneth Walton (Patricia B. Gary also present) for Nancy Powell-Ferri.

GAZIANO, J.  In this case we are asked to answer three questions certified to us by the Connecticut Supreme Court concerning the authority of a trustee to distribute (i.e., to decant) substantially all of the assets of an irrevocable trust into another trust.  The questions, arising out of divorce proceedings pending in Connecticut between Nancy Powell-Ferri and her husband Paul John Ferri, Jr., the beneficiary of a Massachusetts irrevocable trust, are as follows:

> "1.  Under Massachusetts law, did the terms of the Paul John Ferri, Jr. Trust (1983 Trust) . . . empower its trustees to distribute substantially all of its assets (that is, to decant) to the Declaration of Trust for Paul John Ferri, Jr. (2011 Trust)?

> "2.  If the answer to question 1 is 'no,' should either 75% or 100% of the assets of the 2011 Trust be returned to the 1983 Trust to restore the status quo prior to the decanting?

> "3.  Under Massachusetts law, should a court, in interpreting whether the 1983 Trust's settlor intended to permit decanting to another trust, consider an affidavit of the settlor . . . , offered to establish what he intended when he created the 1983 Trust?"

For the reasons we discuss, we answer the first question and third questions yes, and do not answer the second question.

1.  Facts and procedural history.  We recite the relevant facts presented in the Connecticut Supreme Court's statement of facts for certification to this court.

The Paul John Ferri, Jr. Trust, dated June 24, 1983 (1983 Trust), was settled by Paul J. Ferri for the sole benefit of his son, Paul John Ferri, Jr. (Ferri Jr. or beneficiary), when Ferri Jr. was eighteen years old. The trust was created in Massachusetts and is governed by Massachusetts law.

The 1983 Trust establishes two methods by which trust assets are distributed to the beneficiary. First, the trustee may "pay to or segregate irrevocably" trust assets for the beneficiary.[5] Second, after the beneficiary reaches the age of thirty-five, he may request certain withdrawals of up to fixed percentages of trust assets, increasing from twenty-five per cent of the principal at age thirty-five to one hundred per cent after age forty-seven.

Ferri Jr. and Powell-Ferri were married in 1995. In October, 2010, Powell-Ferri filed an action in the Connecticut Superior Court to dissolve the marriage. See Ferri v. Powell-Ferri, 317 Conn. 223, 225 (2015). In March, 2011, the then trustees of the 1983 Trust, Michael J. Ferri and Anthony J. Medaglia, created the Declaration of Trust for Paul John Ferri, Jr. (2011 Trust). They subsequently distributed substantially

---

[5] The beneficiary also may request, within thirty days of a gift to the trust, and subject to the donor's veto of any or all such distribution, to withdraw up to the amount of the gift, preferably from the gift property.

all of the assets of the 1983 Trust to themselves as trustees of the 2011 Trust.

As with the 1983 Trust, Ferri Jr. is the sole beneficiary of the 2011 Trust. The 2011 Trust is a spendthrift trust; under paragraph 1(a), the trustee exercises complete authority over whether and when to make payments to the beneficiary, if at all, and the beneficiary has no power to demand payment of trust assets. The spendthrift provision, in paragraph 4(b), bars the beneficiary from transferring or encumbering his interest and, as with similar provisions in the 1983 Trust, shields the trust from the beneficiary's creditors. The trustees decanted the 1983 Trust out of concern that Powell-Ferri would reach the assets of the 1983 Trust as a result of the divorce action. They did so without informing the beneficiary and without his consent.

At the time of the decanting, pursuant to art. II.B of the 1983 Trust, Ferri Jr. had a right to request a withdrawal of up to seventy-five per cent of the principal. During the course of this action, his vested interest matured into one hundred per cent of the assets the 1983 Trust.

In August, 2011, the plaintiff trustees of the 1983 Trust and the 2011 Trust (trustees) commenced a declaratory judgment action against Powell-Ferri and Ferri Jr. in the Connecticut Superior Court, seeking a declaration that (1) the trustees

validly exercised their powers under the 1983 Trust to distribute and assign the property and assets held by them as trustees of the 1983 Trust to the 2011 Trust; and (2) Powell-Ferri has no right, title, or interest, directly or indirectly, in or to the 2011 Trust or its assets, principal, income, or other property. Powell-Ferri moved for summary judgment, and the trustees file a cross motion. In support of their cross motion, to demonstrate the intent of the settlor of the 1983 Trust, the trustees filed an affidavit from Paul J. Ferri, Sr., dated July 11, 2012.

In August, 2013, the trial judge granted Powell-Ferri's motion for summary judgment and denied the trustees' cross motion, after first having allowed Powell-Ferri's motion to strike the affidavit. In a subsequent memorandum of decision explaining the reasons for the allowance of Powell-Ferri's motion, and awarding specific remedies, the judge ordered restoration of seventy-five per cent of the assets of the 2011 Trust, as they were held in the 1983 Trust; an accounting of the 2011 Trust from inception to the date of restoration; and an award of reasonable attorney's fees to Powell-Ferri.

2. Discussion. The interpretation of a written trust is a matter of law to be resolved by the court. See Mazzola v. Myers, 363 Mass. 625, 633 (1973). The rules of construction of a contract apply similarly to trusts; where the language of a

trust is clear, we look only to that plain language.  See Harrison v. Marcus, 396 Mass. 424, 429 (1985).  "Determining the existence of a contract ambiguity [also] presents a question of law for the court; when a trial judge undertakes the interpretation of an unambiguous contract, the judge's ruling is subject to plenary review on appeal."  Bank v. Thermo Elemental Inc., 451 Mass. 638, 648 (2008), and cases cited.

In deciding whether there is ambiguity, "the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties."  Id. at 648, citing General Convention of the New Jerusalem in the U.S. of Am., Inc. v. MacKenzie, 449 Mass. 832, 835-836, 838 (2007) (analyzing indemnity provision in lease of real property held in trust). Language is ambiguous "where the phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken."  Bank, 451 Mass. at 648, quoting President & Fellows of Harvard College v. PECO Energy Co., 57 Mass. App. Ct. 888, 896 (2003).  If a court concludes that such ambiguity exists, "[w]hen interpreting trust language, . . . we do not read words in isolation and out of context.  Rather we strive to discern the settlor's intent from the trust instrument as a whole and from the circumstances known to the settlor at the time the instrument was executed."

Hillman v. Hillman, 433 Mass. 590, 593 (2001), citing Pond v. Pond, 424 Mass. 894, 897 (1997).

"It is fundamental that a trust instrument must be construed to give effect to the intention of the donor as ascertained from the language of the whole instrument considered in the light of circumstances known to the donor at the time of its execution." Watson v. Baker, 444 Mass. 487, 491 (2005), quoting Powers v. Wilkson, 399 Mass. 650, 653 (1987). "[E]xtrinsic evidence may be admitted when a contract is ambiguous on its face or as applied to the subject matter. The initial ambiguity must exist, however . . . . [E]xtrinsic evidence cannot be used to contradict or change the written terms, but only to remove or to explain the existing uncertainty or ambiguity." General Convention of the New Jerusalem in the U.S. of Am., Inc., 449 Mass. at 836. "In determining the meaning of a contractual provision, the court will prefer an interpretation 'which gives a reasonable, lawful and effective meaning to all manifestations of intention, rather than one which leaves a part of those manifestations unreasonable, unlawful or [of] no effect'" (citation omitted) Siebe, Inc. v. Louis M. Gerson Co., 74 Mass. App. Ct. 544, 550 n.13 (2009).

We first authorized the trustee of an irrevocable trust to decant a trust in Morse v. Kraft, 466 Mass. 92, 99 (2013).[6] In that case, we allowed the trustee to decant four subtrusts into four new subtrusts, one for each of the named beneficiaries, who had been minors when the first trust was created and who had reached the age of majority before the trust was decanted. Id. at 93. In doing so, we relied on specific language in the trust, which did not explicitly authorize decanting, and the trustee's broad powers under that trust instrument. Id. at 97, 99. We declined, however, to recognize an inherent power allowing a trustee to decant irrespective of the language of the trust. Id. at 99. Accordingly, a trustee's decanting authority turns on the facts of each case and the terms of the instrument that establishes the trust. Id. at 97.

With these standards in mind, we turn to consideration of the questions certified by the Connecticut Supreme Court.

a. Question 1. The term decanting ordinarily is "used to describe the distribution of [irrevocable] trust property to another trust pursuant to the trustee's discretionary authority to make distributions to, or for the benefit of, one or more beneficiaries [of the original trust]." Morse, 466 Mass. at 95. Decanting has the effect of "amend[ing] an unamendable trust, in

_____

[6] That decision was issued during the pendency of the proceedings in the Connecticut court; the trustees filed a copy of the decision in that court in July, 2013.

the sense that [the trustee] may distribute the trust property to a second trust with terms that differ from those of the original trust." Id. The rationale underlying the authority to decant is that if a trustee has the discretionary power to distribute property to or for the benefit of the beneficiaries, the trustee likewise has the authority to distribute the property to another trust for the benefit of those same beneficiaries. Id.

In the absence of a specific statutory provision allowing decanting, we have determined that a trustee of a Massachusetts irrevocable trust may be given the authority to decant assets in further trust through language in the trust. Id. In determining whether a trustee has such authority, the intent of the settlor is "paramount." Id. at 98. See C.E. Rounds, Jr., & C.E. Rounds, III, Loring & Rounds: A Trustee's Handbook § 6.1.2 (2017) (Loring & Rounds). See also P.M. Annino, Estate Planning § 13.42 (3d ed. 2007) (trust decanting). While we explicitly have declined to adopt a formulaic rule regarding trustees' powers to decant trust assets, see Morse, 466 Mass. at 99, some general principles provide guidance. The authority to decant need not be expressly granted to the trustee in the declaration of trust, id. at 98; a court may conclude that such authority exists based on other trust language, id. at 96-97. The determination is reached by assessing the terms of a particular

trust instrument and other relevant evidence of the settlor's intent. Id. at 97. When deciding whether a particular trust authorized a trustee to decant, "the language used by the donor viewed in light of the rule of law in effect . . . at the time the powers in question were created" is "particularly significant" (citation omitted). Id. at 98. See S.M. Dunphy, Probate Law and Practice § 39.2 (2d ed. 1997) (powers of trustees).

Here, after having examined the extremely broad authority and discretion afforded the trustees by the 1983 Trust declaration of trust, the anti-alienation provision of the 1983 Trust, the beneficiary withdrawal rights afforded under the terms of the 1983 Trust, and the settlor's affidavit, we conclude that the terms of the 1983 Trust, read as a whole, demonstrate the settlor's intent to permit decanting.

i. Trustee's discretion. A trustee's broad discretion to distribute the assets of an irrevocable trust may be evidence of a settlor's intent to permit decanting. In Morse, 466 Mass. at 98, for instance, we noted the trustee's "almost unlimited" discretion, and that the only constraint on the discretion to "distribute property directly to, or [to apply it] for the benefit of, the trust beneficiaries, [was] . . . that such distributions must be 'for the benefit of' such beneficiaries." We considered also that the trustee in that case had the

authority to "exercise his 'full power' and 'discretion,'" without seeking prior court approval. Id. at 99. States that have enacted explicit decanting provisions similarly look to a trustee's broad authority to distribute principal from the trust for the benefit of one or more of the beneficiaries when determining whether the trustee has the authority to decant. See, e.g., Fla. Stat. § 736.04117.[7] Indeed, having reviewed what she concluded were the then eleven states to have enacted explicit statutory provisions allowing decanting, the Connecticut trial court judge noted this in her decision and commented that, if appropriate at all, the authority to decant would be, in her view, contingent upon a very broad discretion on the part of a trustee.

The 1983 Trust contains three provisions relative to the trustee's discretion to distribute assets that are virtually

---

[7] Florida Statutes § 736.04117 provides in relevant part:

"(1)(a) Unless the trust instrument expressly provides otherwise, a trustee who has absolute power under the terms of a trust to invade the principal of the trust, referred to in this section as the 'first trust,' to make distributions to or for the benefit of one or more persons may instead exercise the power by appointing all or part of the principal of the trust subject to the power in favor of a trustee of another trust, referred to in this section as the 'second trust,' for the current benefit of one or more of such persons under the same trust instrument or under a different trust instrument; provided:

"1. The beneficiaries of the second trust may include only beneficiaries of the first trust . . . ."

identical to provisions in the <u>Morse</u> trust.  Article II.A provides, "So long as [the beneficiary] is living, [the trustee] shall, from time to time, pay to or segregate irrevocably for later payment to [the beneficiary], so much of the net income and principal of this trust as [the trustee] shall deem desirable for [the beneficiary's] benefit . . . ."  Article V.A states, "Wherever provision is made hereunder for payment of principal or income to a beneficiary, the same may instead be applied for his or her benefit."  In addition, art. VI provides that the trustee "shall have full power to take any steps and do any acts which he may deem necessary or proper in connection with the due care, management and disposition of the property and income of the trust hereunder . . . in his discretion, without order or license of court."

The 1983 Trust also contains a number of additional provisions authorizing the trustee to distribute assets. Article II (Disposition of the Trust Property) sets forth the means by which the trustee may "dispose of the trust property" during the beneficiary's life.  Article II.A states that, so long as the beneficiary is living, the trustee shall "from time to time, pay to or <u>segregate irrevocably</u> for later payment to [the beneficiary], as much of the net income and principal of this trust as [the trustee] shall deem desirable for [the beneficiary's] benefit" (emphasis supplied).

Viewing the language of the 1983 Trust in its entirety, the trustee's extremely broad discretion is evident throughout the trust instrument. The 1983 Trust plainly allows the trustee far more expansive discretion to act than even the broad discretion we recognized in Morse, supra, with no oversight other than the requirement to provide reporting from time to time at the request of the beneficiary.

The explicit authority of the trustee of the 1983 Trust to "segregate irrevocably for later payment to" the trust beneficiary further indicates the settlor's intention to allow decanting. In common usage, to "segregate" means "to separate or set apart from others or from the general mass or main body: isolate," "to cause or force the separation of," "to separate or withdraw (as from others or from a main body)." Webster's Third New International Dictionary 2056-2057 (2003) (Webster's). See Black's Law Dictionary 1563 (10th ed. 2014) (defining "segregate" as "[t]o separate or make distinct from others or from a general aggregate; to isolate" and "[t]o cause or require separation from others"). "Irrevocable" means "incapable of being recalled or revoked" and "unalterable." Webster's, supra at 1196. Decanting trust assets to an irrevocable trust is one way to "segregate" assets "irrevocably." See Morse, 466 Mass. at 98, quoting Loring v. Karri-Davies, 371 Mass. 346, 349-350 (1976) ("We believe that 'it is fair to suppose that the [donor]

in using the language which appears in the [trust] had in mind the interpretation of similar words and clauses").

This interpretation of art. II.A is supported by language in art. V.A:  "Wherever provision is made hereunder for payment of principal or income to a beneficiary, the same may instead be applied for his or her benefit" (emphasis supplied).  This power parallels the language and grant of authority that we concluded authorized decanting in Morse, 466 Mass. at 96-98 (trust authorized decanting under trustee's power to "pay to" beneficiary or to apply payments of income or principal for benefit of beneficiary).  We stated explicitly in Morse that we declined to rely on a particular form of words in determining whether the language of a particular trust allowed decanting, and that we would focus foremost on determining the settlor's intent.  Here, however, where the language of the trust is almost identical to that we found to have conveyed the authority to decant in Morse, and where the settlor's intention to convey to the trustee almost unlimited discretion to act is evident, the conclusion that the settlor intended to authorize decanting would seem to follow necessarily.

There are, however, two sections of the trust language that might suggest, as Powell-Ferri argues, a conclusion to the contrary, and we turn next to these provisions.

ii. _Anti-alienation provision_. Article V.B of the 1983 Trust provides that "[n]either the income nor the principal of any trust hereunder shall be alienable by any beneficiary . . . and the same shall not be subject to be taken by his or her creditors by any process whatever." When interpreting trust language, words should not be read "in isolation and out of context." _Hillman_, 433 Mass. at 593. Courts "strive to discern the settlor's intent from the trust instrument as a whole and from the circumstances known to the settlor at the time the instrument was executed." _Id_. Viewing the 1983 Trust document "as a whole, and giving due weight to all of its language," _id_., we conclude that empowering the trustee to decant is consistent with this anti-alienation provision.

We have said, when confronting similar language, that this type of anti-alienation provision "evidences the settlor's intent to protect the trust income and principal from invasion by the beneficiary's creditors." _Bank of New England_ v. _Strandlund_, 402 Mass. 707, 709 (1988). It follows that if a settlor intended a trust's assets to be protected from creditors, he or she necessarily intended that the trustee have the means to protect the trust assets, consistent with his or her fiduciary duties.[8]

---

[8] Nancy Powell-Ferri argues that, under Massachusetts law, a party to a divorce is not a "creditor" for the purposes of this

iii.   _Beneficiary withdrawal provisions_.  Article II.B of the 1983 Trust provides that the trustee "shall pay to [the beneficiary] after he has attained the age of thirty-five (35) years such amounts of principal as he may from time to time in writing request," with explicit limitations on the percentage of the principal that may be withdrawn at different ages, up to the age of forty-seven, after which the beneficiary is entitled to withdraw one hundred per cent of the trust assets.[9]

At the time the trustees decanted the 1983 Trust assets into the 2011 Trust, under the terms of art. II.B, the beneficiary had the right to request a withdrawal of up to seventy-five per cent of the principal of the 1983 Trust. During the pendency of this action, the beneficiary reached the age of forty-seven, and his irrevocable vested interest matured into one hundred per cent of the corpus of the trust.  The beneficiary states that, throughout the life of the 1983 Trust,

---

type of provision, and that a trust is marital property subject to equitable distribution notwithstanding an anti-alienation provision.  See _Lauricella_ v. _Lauricella_, 409 Mass. 211, 216-217 (1991).  Any question concerning the equitable distribution of the trust assets is not part of the certified questions to this court and is not properly before us.  See _DiFiore_ v. _American Airlines, Inc._, 454 Mass. 486, 488 n.4 (2009).

[9] The limitations on the percentage of the principal that the beneficiary may withdraw are as follows:  beginning at age thirty-five, the beneficiary could request in writing a distribution of up to twenty-five per cent of the trust principal; after reaching age thirty-nine, up to fifty per cent; and beginning at age forty-three, up to seventy-five per cent. Beginning at age forty-seven, there is no limitation.

he has requested and received only a small percentage of the trust assets.

Powell-Ferri argues that the beneficiary's right under the 1983 Trust to request a withdrawal of a certain percentage of trust assets is wholly inconsistent with the authority to decant. She contends that decanting the 1983 trust into the 2011 spendthrift trust impaired the interests of the beneficiary to withdraw trust assets upon written request.

We do not agree, for three reasons. First, Powell-Ferri's contention runs counter to our mandate to read trust provisions consistently with the entire trust document, and in a manner that gives effect to all trust language. See Hillman, 433 Mass. at 593 ("When interpreting trust language, . . . we do not read words in isolation and out of context. Rather, we strive to discern the settlor's intent from the trust instrument as a whole . . ."). If the trustee were unable to decant the portion of trust assets made "withdrawable" as the beneficiary reached certain age milestones, the trustee correspondingly would lose the ability to exercise his or her fiduciary duties (including the duty to invest and protect the assets' purchasing power) over those assets, eventually losing power to control one hundred per cent of the assets upon the beneficiary turning forty-seven years of age, pursuant to art. II.B. Under Powell-Ferri's interpretation, the trustee effectively would be without

a role upon the beneficiary's reaching the age of forty-seven. This interpretation makes little sense.

Second, a trustee holds "full legal title to all property of a trust and the rights of possession that go along with it." McClintock v. Scahill, 403 Mass. 397, 399 (1988). See Welch v. Boston, 221 Mass. 155, 157 (1915) ("It is one of the fundamental characteristics of trusts that the full and exclusive legal title is vested in the trustee"). Here, at the time the trustees decanted substantially all of the 1983 Trust's assets to the 2011 Trust, the beneficiary had withdrawn only a small percentage of the assets under art. II.B. Therefore, a substantial portion of the trust assets remained in the 1983 Trust, subject to the trustee's authority and stewardship.

In analyzing the meaning of this provision, it is instructive to consider the circumstance of the termination of a trust. When a trust terminates, the beneficiaries obtain a vested interest in the trust property that is not unlike the beneficiary's withdrawal right here. Notwithstanding this vested right, however, the trustee of a terminated trust retains ongoing duties to control and protect the trust assets, and may continue to act pursuant to the powers provided under the trust instrument. See Rothwell v. Rothwell, 283 Mass. 563, 570, 572 (1933) (following trust's termination date, "the duties and powers of the trustees do not cease" until trust property is

conveyed, and, until such conveyance, "the trustees [have] power to perform any act incidental to the conservation of the [trust] property"). See Loring & Rounds, supra at § 8.2.3 ("A trustee of a terminated trust has continuing fiduciary responsibilities. . . . It is not until the trustee is done 'winding up' the trust's administration, to include making distribution 'in a manner consistent with the purposes of the trust and the interests of the beneficiaries,' is the trustee relieved of fiduciary duties" [citations omitted]).

Third, this mechanism for the beneficiary's withdrawal of trust assets does not limit the trustee's decanting authority. The two mechanisms for distribution provided under art. II are not mutually exclusive. We read arts. II.A and II.B as comprising a unified framework governing distribution of the trust assets whereby, under art. II.B, the beneficiary has a graduating right of withdrawal of those trust assets that have not been distributed pursuant to the trustee's payment to him or to the irrevocable sequestering of trust property under art. II.A.

Further, in reading arts. II.A and II.B as a coherent whole, we note that the 1983 Trust empowers the trustee to segregate assets irrevocably for "[s]o long as [the beneficiary] is living," in other words, both before the beneficiary's withdrawal rights began to vest at the age of thirty-five, and

thereafter.  This authority is counter to Powell-Ferri's argument that the settlor intended to bar decanting after the beneficiary gained withdrawal rights at the age of thirty-five. If decanting were so barred, art. II.A would not have allowed irrevocable sequestration for "[s]o long as [the beneficiary] is living."

Accordingly, reading the entirety of art. II in harmony, it provides that, unless and until all of the trust assets were distributed in response to the beneficiary's request for a withdrawal, the trustee could exercise his or her powers and obligations under the 1983 Trust, including the duty to decant if the trustee deemed decanting to be in the beneficiary's best interest.[10,11]

b.  Question 3.  The third certified question asks whether, under Massachusetts law, a court should consider an affidavit by the settlor, stating his intent in establishing the 1983 Trust,

---

[10] We are cognizant that the Connecticut judge relied heavily in her determination that the decanting was not authorized under the terms of the 1983 Trust based on her understanding of divorce law in Connecticut, and its policies that all assets of a marriage on the date that an action for dissolution is filed are available for later distribution.  We note in this regard, as the trial judge herself apparently already has anticipated by suggesting an alternative order for payment of alimony if the decanting is deemed proper, that the alimony order may be revised in light of this determination as to the trust assets.  See Pfannenstiehl v. Pfannenstiehl, 475 Mass. 105, 106 (2016).

[11] Given this, we need not reach Question 2, which is applicable only if we were to have answered "No" to Question 1.

in reaching a determination whether, in creating the 1983 Trust, the settlor intended to permit decanting to another trust. Where, as here, there is any question of ambiguity concerning the settlor's intent, Massachusetts courts may consider extrinsic evidence. See, e.g., General Convention of the New Jerusalem in the U.S. of Am., Inc., 449 Mass. at 835-836.

In determining the settlor's intent on the question of decanting in Morse, 466 Mass. at 99, we considered the settlor's affidavit and noted that it provided "affirmative evidence of the settlor's intent that the terms of the [Morse trust] give the plaintiff decanting power in the form of affidavits from the settlor, draftsman, and trustee." We also cited the Restatement (Third) of Property as further support for the use of postexecution affidavits as affirmative evidence. See id.; Restatement (Third) of Property: Wills and Other Donative Transfers § 10.2 & comment g (2003) ("In seeking to determine the donor's intention, all relevant evidence, whether direct or circumstantial, may be considered, including the text of the donative document and relevant extrinsic evidence"). See also Loring & Rounds, supra at Introduction ("In the case of an irrevocable inter vivos trust, the settlor's intentions at the time of funding are what determine its terms. That having been said, postfunding statements of the settlor might be admissible to clarify what those intentions were" [emphasis in original;

footnote omitted]).  Indeed, this court has allowed the reformation of a trust instrument to conform to the settlor's intent, and has permitted the introduction of an affidavit by the drafter to show that the language of the instrument was inconsistent with the intent of the settlor.  See Walker v. Walker, 433 Mass. 581, 587 (2001).

The settlor's affidavit, dated July 11, 2012, states, in pertinent part:

> "I intended to give to the trustee of the 1983 Trust the specific authority to do whatever he or she believed to be necessary and in the best interest of my son Paul John Ferri, Jr. with respect to the income and principal of the 1983 Trust notwithstanding any of the other provisions of the 1983 Trust. . . .  Therefore, if the trustee thought at any time that the principal and income of the 1983 Trust could be at risk, the trustee could take any action necessary to protect the principal and income of the 1983 Trust. . . .  This authority to protect assets would also extend to a situation where creditors of Paul John Ferri, Jr. may attempt to reach the assets of the 1983 Trust such as in the event of lawsuit or a divorce."

Because, where there is ambiguity, a court may consider an affidavit of the settlor in interpreting whether the settlor intended to permit decanting to another trust, see, e.g., Bank, 451 Mass. at 649, we consider the settlor's affidavit regarding his intentions at the time that he created the 1983 Trust, which the Connecticut trial court judge ordered struck on Powell-Ferri's motion.  In considering this affidavit, we do not "create an ambiguity [where] the plain language is unambiguous." General Convention of the New Jerusalem in the U.S. of Am.,

Inc., 449 Mass. at 835. Nor do we agree with Powell-Ferri's argument that the affidavit was offered improperly to alter the terms of the declaration of trust. Given that the declaration of the 1983 Trust expressly neither permits nor bars decanting, the affidavit does not contradict or attempt to vary the terms of the trust.

The statements in the settlor's affidavit further support the settlor's evident intention in the language of the 1983 Trust document, including the power to "segregate irrevocably" under art. II.A and the beneficiary's right to request withdrawals of trust assets at certain age milestones under art. II.B, to provide the trustee with the power to decant. Because the intent of the settlor is "paramount," Morse, 466 Mass. at 98, and the settlor's affidavit evidences the settlor's intent at the time of execution, the settlor's affidavit should be considered.

3. Disposition. An order shall issue to the Connecticut Supreme Court answering the certified questions as follows: We answer Question 1, "Yes"; we do not answer Question 2; and we answer Question 3, "Yes."

The Reporter of Decisions is directed to furnish attested copies of this opinion to the clerk of this court. The clerk in turn will transmit one copy, under the seal of the court, to the clerk of the Connecticut Supreme Court, as the answer to the

questions certified, and will also transmit a copy to each party.

GANTS, C.J. (concurring, with whom Lenk and Budd, JJ., join).  I agree with the court, for all the reasons given by the court, that under Massachusetts law the terms of the 1983 Trust empower its trustees to decant its assets to a trust newly created by the trustees.  I write separately to emphasize what we did not decide in answering the reported questions certified to us by the Connecticut Supreme Court:  whether Massachusetts law will permit trustees in Massachusetts to create a new spendthrift trust and decant to it all the assets from an existing non-spendthrift trust where the sole purpose of the transfer is to remove the trust's assets from the marital assets that might be distributed to the beneficiary's spouse in a divorce action.

The Connecticut Supreme Court held that, under Connecticut law, the public policy that would prevent one spouse during a divorce proceeding from transferring marital assets to deprive the other spouse of those assets did not apply here because it was undisputed that the beneficiary husband did not have a role in creating the new 2011 Trust or in decanting the assets from the 1983 Trust to the 2011 Trust.  Ferri v. Powell-Ferri, 317 Conn. 223, 233-234 (2015).  The trial court had found that the trustees of the 1983 Trust, one of whom was the husband's brother, did not consult with the husband before taking these steps to frustrate the wife's equitable claim to these assets.

Our opinion, because it simply answered certified questions from another State Supreme Court, appropriately did not address whether we would find the creation of a new spendthrift trust intended solely to deprive the beneficiary's spouse of marital assets during a divorce proceeding through a decanting to be invalid as contrary to public policy under Massachusetts law.

Under the Massachusetts Uniform Trust Code, G. L. c. 203E, § 404, "A trust may be created only to the extent its purposes are lawful and not contrary to public policy." Where, as here, the trustees created a new spendthrift trust for the sole purpose of decanting the assets of an earlier trust that, at least in part, would be included within the marital assets available for distribution during a divorce proceeding, § 404 would require us to consider whether the creation of the new spendthrift trust was contrary to public policy.

Before the enactment of § 404, we held under our common law that a trust is void when it is contrary to public policy. See Perkins v. Hilton, 329 Mass. 291, 294-295 (1952) (trust for mother's benefit was "illegal and invalid" where it was part of attempt by defendant to obtain special benefits of servicemen's readjustment act to which only veterans are entitled, and was "in effect a fraud upon the act and contrary to public policy"); Otis v. Prince, 10 Gray 581, 581 (1858) (trust that required trustee to pay net income from trust to testator's grandson only

"so long as he shall remain unmarried" was void as contrary to public policy).  See generally Restatement (Third) of Trusts § 29 (2003) ("An intended trust or trust provision is invalid if its purpose or performance is unlawful or against public policy").

Similarly, under our common law of contract, we have declared that "it is a principle universally accepted that the public interest in freedom of contract is sometimes outweighed by public policy, and in such cases the contract will not be enforced."  Beacon Hill Civic Ass'n v. Ristorante Toscano, Inc., 422 Mass. 318, 321 (1996).  We have applied this principle by declining to enforce various contracts that we concluded were contrary to public policy.  See, e.g., A.Z. v. B.Z., 431 Mass. 150, 160 (2000) (contracts that "compel [a] donor [of frozen preembryos] to become a parent against his or her will" violate public policy); Liberty Mut. Ins. Co. v. Tabor, 407 Mass. 354, 360-361 (1990) ("a provision in an insurance policy that provides coverage only when there is no liability is void as against public policy"); Osborne v. Osborne, 384 Mass. 591, 599 (1981) ("certain contracts may so unreasonably encourage divorce as to be unenforceable").

Under our common law of employment, we have held that, in certain limited circumstances, an employer may be held liable for discharging an at-will employee "for a reason that violates

clearly established public policy." Upton v. JWP Businessland, 425 Mass. 756, 757 (1997). See, e.g., Flesner v. Technical Communications Corp., 410 Mass. 805, 810 (1991) (terminating at-will employee for cooperating with United States Customs Service officials who were investigating his employer violates public policy); DeRose v. Putnam Mgt. Co., 398 Mass. 205, 208-211 (1986) (terminating at-will employee for failing to give false testimony against coworker violates public policy).

I do not offer any prediction as to whether this court might invalidate as contrary to public policy a new spendthrift trust created for the sole purpose of decanting the assets from an existing non-spendthrift trust in order to deny the beneficiary's spouse any equitable distribution of these trust assets. I simply make clear that, in this opinion, we do not decide this issue; we will await a case that presents such an issue before we decide it.

I also note that the Legislatures of at least twenty-five States have codified limitations on decanting from one trust to another by statute.[12] If our Legislature were to choose to enact

---

[12] Alaska Stat. § 13.36.157; Ariz. Rev. Stat. Ann. § 14-10819; Colo. Rev. Stat. §§ 15-16-901 et seq.; Del. Code Ann. tit. 12, § 3528; Fla. Stat. § 736.04117; 760 Ill. Comp. Stat. 5/16.4; Ind. Code § 30-4-3-36; Ky. Rev. Stat. Ann. § 386.175; Mich. Comp. Laws §§ 556.115a, 700.7820a; Minn. Stat. § 502.851; Mo. Rev. Stat. § 456.4-419; Nev. Rev. Stat. § 163.556; N.H. Rev. Stat. Ann. §§ 564-B:4-418, 564-B:4-419; N.M. Stat. Ann. §§ 46-12-101 et seq.; N.Y. Est. Powers & Trusts Law § 10-6.6; N.C.

its own decanting statute, I would urge it to consider the use of decanting presented in this case.

---

Gen. Stat. § 36C-8-816.1; Ohio Rev. Code Ann. § 5808.18; R.I. Gen. Laws § 18-4-31; S.C. Code Ann. § 62-7-816A; S.D. Codified Laws §§ 55-2-15 to 55-2-21; Tenn. Code Ann. § 35-15-816; Tex. Prop. Code Ann. §§ 112.071 et seq.; Va. Code Ann. § 64.2-778.1; Wis. Stat. § 701.0418; Wyo. Stat. Ann. § 4-10-816.