NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

17-P-30                                          Appeals Court

OLIVER C. BIEWALD  vs.  SEVEN TEN STORAGE
SOFTWARE, INC., & others.[1]


No. 17-P-30.

Essex.     December 4, 2017. - October 31, 2018.

Present:  Green, Maldonado, & Kinder, JJ.


Massachusetts Wage Act.  Contract, Employment, Performance and
     breach, Construction of contract, Condition precedent,
     Implied covenant of good faith and fair dealing.  Practice,
     Civil, Judgment notwithstanding verdict, Summary judgment,
     Costs.  Employment, Retaliation.



     Civil action commenced in the Superior Court Department on
October 18, 2012.

     A motion for summary judgment was heard by Robert N.
Tochka, J.; the case was tried before Diane M. Kottmyer, J.; a
motion for judgment notwithstanding the verdict was heard by
Kottmyer, J.; and a motion for costs was considered by Kottmyer,
J.


     Sarah A. Catignani for the plaintiff.
     Bradley L. Croft (Michael J. Duffy also present) for the
defendants.

_____

     [1] Seven Ten Storage Software, LLC; Brojaban, Inc.; Robert J.
Moulton; James F. Moulton; and Gary J. LaFreniere.

MALDONADO, J.  Oliver C. Biewald commenced this action against his former employer, Seven Ten Storage Software, Inc., now known as Brojaban, Inc., and Seven Ten Software, LLC (collectively, Seven Ten), and several of its executives asserting a variety of claims related to the nonpayment of sales commissions.  A Superior Court judge dismissed most of those claims on the defendants' motion for summary judgment.  A second judge then presided over a trial of the remaining claims, at the conclusion of which the jury found largely in favor of Biewald and awarded him damages for violations of the Wage Act, G. L. c. 149, § 148, and breach of his employment agreement.  In response to the defendants' motion for judgment notwithstanding the verdict, however, the trial judge, who had reserved ruling on the defendants' motions for a directed verdict during the trial, vacated the verdict and ordered judgment for the defendants.  The judge concluded that Biewald's claims were barred by the unambiguous provisions of his employment agreement.  She further concluded that, even assuming the employment agreement was ambiguous, the verdict could not be sustained on any reasonable view of the evidence.  On appeal from the final judgment, Biewald challenges that ruling and the dismissal of certain claims on summary judgment.[2]  He also

---

[2] Biewald does not challenge on appeal the motion judge's decision on several of his claims.

appeals from a postjudgment order awarding costs to the defendants.  We affirm.

Background.  On June 22, 2007, Seven Ten, a "startup" company that developed and marketed data storage software, entered into a written agreement (employment agreement) with Biewald to employ him as vice president of strategic sales. Under the terms of the employment agreement, Biewald was entitled to an annual salary of $60,000 and to commissions as follows:

> "3.4  Commissions.  The Employee shall receive payment for any sale, purchase, transfer, or contract for the services, licenses, and/or products -- for internal use, distribution or for resale -- of Employer products/services ('Sale') to the companies defined in and agreed upon in the attached Exhibit A (Exclusive List) at such time as any consideration for such sale is provided to Employer, whether in the form of purchase orders, promissory notes, letters of intent, monies, cash, stock, options for stock, or any other consideration in any form whatsoever ('Consideration'); the commission shall be 50% (fifty percent) of said sale. . . .

> "3.4.1  Guaranteed contracts.  For all OEM/Partner/Reseller/Distributor contracts signed with a committed and guaranteed revenue stream to Employer, Employee shall receive, in addition to the commissions stated in Section 3.4, Five Percent (5%) of the guaranteed revenue payable upon execution of such agreement. Commissions on contract hereunder will be paid upon receipt of payment by OEM/Partner/Reseller/Distributor."

The employment agreement had no defined term and instead provided that Biewald was an at-will employee, who could be terminated at any time, with or without cause.  Upon such termination, the employment agreement further provided, in

section 2, that only certain sections of the employment agreement would survive. Sections 3.4 and 3.4.1 were not included among those sections.

Approximately two years later, on September 2, 2009, Seven Ten, through Biewald's efforts, entered into a distributor agreement (EMC contract) with EMC Corporation (EMC) that fell within section 3.4 of Biewald's employment agreement. However, because the EMC contract did not provide Seven Ten with a committed or guaranteed revenue stream, it did not qualify as a "guaranteed contract" under section 3.4.1 of the employment agreement.[3] In fact, while EMC had the right under the EMC contract to make purchases from Seven Ten, it was not obligated to do so. The only way that Seven Ten could realize revenue under the EMC contract was if EMC subsequently chose to submit a purchase order. Theoretically, the EMC contract could expire without EMC ever having submitted an order. Seven Ten, meanwhile, was obligated to pay EMC $51,000 over the term of the EMC contract for admittance to EMC's so-called "Select" program.

At the time, Seven Ten was, like many companies, struggling in the wake of the worldwide financial crisis and facing an uncertain future unless it could secure a fresh infusion of

---

[3] Biewald never secured a guaranteed contract or qualified for a commission under section 3.4.1, but he did qualify for commissions under section 3.4 on over forty occasions.

capital.  In the summer of 2009, a new investor -- an "angel" investor -- had surfaced.  The new investor conditioned its investment on Seven Ten's implementation of various changes, including the reform of existing employment contracts.  On October 9, 2009, therefore, Seven Ten notified Biewald that his employment agreement was being terminated, effective at the end of that month.

Seven Ten also expressed a desire to retain Biewald's services, if new employment terms could be agreed upon.  In the meantime, it agreed to increase Biewald's annual salary to $75,000 but reduced his commission rate in stages (forty per cent for November, thirty per cent for December, and ten per cent on and after January 1, 2010), effective November 1, 2009.

Over the following weeks, Biewald and Seven Ten engaged in negotiations, with Biewald primarily expressing concern over whether he would still be paid commissions he believed he had already earned under section 3.4 of the employment agreement.  On November 24, 2009, with no new employment agreement in place, Seven Ten notified Biewald that, forthwith, it was further reducing his compensation to salary only, with no commissions.  Then, on December 2, 2009, after a meeting that again failed to result in an agreement, Seven Ten terminated Biewald's employment altogether, effective the same day.

Subsequently, Seven Ten paid Biewald commissions based on the new forty per cent rate imposed as of November 1, 2009, on two EMC-related purchase orders received on November 20 and 24, 2009.  There was also a third EMC-related purchase order received on November 30, 2009, on which Seven Ten refused to pay any commission, citing the "salary only" compensation terms imposed as of November 25, 2009.  Seven Ten also refused to pay Biewald for any EMC-related purchase orders received after the December 2, 2009, employment termination date.

In response, Biewald filed a wage complaint with the Attorney General's office and then commenced this action, claiming, inter alia, that he was entitled, under section 3.4 of the employment agreement, to be paid a fifty per cent commission on all EMC-related purchase orders, whether they were received before or after the termination of his employment.  The jury agreed with Biewald and awarded him $10,730 under the Wage Act based on the balance due for commissions on the November 20, 24, and 30, 2009, purchase orders, and $807,376 under the employment agreement for unpaid commissions on EMC-related purchase orders received after December 2, 2009.  However, the trial judge vacated the verdict and ordered judgment for the defendants. This appeal followed.

Analysis.  1.  Judgment notwithstanding the verdict.  a. Standard.  A ruling on a motion for judgment notwithstanding the

verdict presents a question of law that we review under the same standard as the trial judge, construing the evidence in the light most favorable to the nonmoving party -- here, Biewald. O'Brien v. Pearson, 449 Mass. 377, 383 (2007).  The standard is whether the evidence, construed against the defendants, justifies the jury verdict against them.  Id.  "Our duty in this regard is to evaluate whether anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be made in favor of [Biewald]" (quotation omitted).  Id.

   b.  Determination of ambiguity.  Biewald first argues that the trial judge erred when she determined that the employment agreement unambiguously extinguished any right he might have had under section 3.4 to collect commissions on EMC-related purchase orders received after the employment agreement was terminated. The interpretation of a contract, including the determination regarding ambiguity, presents a question of law for the court, subject on appeal to de novo review.  See Balles v. Babcock Power Inc., 476 Mass. 565, 571 (2017).[4]  The rules of interpretation are well established.  "To answer the ambiguity question, the court must first examine the language of the

_____

   [4] Given the de novo nature of our review, we need not address Biewald's claim that the trial judge based her ambiguity determination, in part, on language that does not appear in the employment agreement.

contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties." Bank v. Thermo Elemental Inc., 451 Mass. 638, 648 (2008). "The words of a contract must be considered in the context of the entire contract rather than in isolation. . . . When the words of a contract are clear, they must be construed in their usual and ordinary sense . . . ." General Convention of the New Jerusalem in the U.S. of Am., Inc. v. MacKenzie, 449 Mass. 832, 835 (2007). "[A]n ambiguity is not created simply because a controversy exists between the parties, each favoring an interpretation contrary to the other." Boazova v. Safety Ins. Co., 462 Mass. 346, 351 (2012), quoting Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). "Language is ambiguous where the phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken" (quotation omitted). Ferri v. Powell-Ferri, 476 Mass. 651, 654 (2017).

According to Biewald, the language of section 3.4 of the employment agreement is reasonably susceptible to more than one interpretation, thereby rendering it ambiguous. Specifically, he contends that one reasonable interpretation is that his right to a commission vested the moment he made a "Sale," and that only his right to payment of that commission had to await Seven Ten's receipt of "Consideration." In the case of the EMC

contract, therefore, he contends his right to a commission vested the moment the EMC contract was executed on September 2, 2009, while only his right to payment of that commission had to wait until EMC provided a purchase order.  We disagree.

There is no distinction in section 3.4 of the employment agreement between a right to a commission and a right to be paid a commission.  The plain language provides that Biewald was entitled to be paid a commission on a "'Sale' . . . at such time as any consideration for such sale [was] provided to [Seven Ten]."  Clearly, there were two conditions precedent, a "Sale" and "Consideration."  And, whether one views it as a right to a commission or a right to be paid a commission, that right did not arise (or vest) until both conditions were satisfied.  The employment agreement also plainly provided, in section 2, that only certain sections of the employment agreement survived termination.  Section 3.4 was not one of those sections.  Whatever rights Biewald had under section 3.4, therefore, did not survive unless there had already been a "Sale" accompanied by "Consideration."

Even assuming, as we do, that the EMC contract qualified as a "Sale" under section 3.4 of the employment agreement,[5] it is

---

[5] While the defendants suggest otherwise, there is a reasonable argument that the EMC contract was a "contract for the services, licenses, and/or products -- for internal use, distribution or for resale -- of [Seven Ten] products/services."

undisputed that no "Consideration" was provided at the time the EMC contract was executed. EMC did not commit to make any purchases from Seven Ten and only became obligated to pay Seven Ten if and when EMC submitted a subsequent purchase order. "Consideration," therefore, was provided, and Biewald's commission rights vested, only when a purchase order was submitted. Therefore, once Biewald's employment agreement was terminated, he was entitled to commissions in the rates specified under that agreement only for those purchase orders submitted, with consideration, on or before October 31, 2009. We conclude, therefore, that under the plain language of the employment agreement, Biewald was not entitled to commissions at the rates provided under section 3.4 on the November 20, 24, or 30, 2009, purchase order, or on any EMC-related purchase orders received thereafter. The jury verdict, therefore, could not stand.[6]

c. Assuming an ambiguity. Biewald further argues that the trial judge erred when she determined that, even if the employment agreement was ambiguous, the jury verdict was not supported by any view of the evidence. However, Biewald has not

_____

[6] Contrary to Biewald's assertion, the defendants adequately relied on the language of sections 2 and 3.4 of the employment agreement when they moved for a directed verdict. The argument, therefore, was not waived.

identified, and we have not located, any extrinsic evidence that supports his interpretation of the employment agreement.[7] Even assuming an ambiguity, therefore, he failed to sustain his burden of proof, and judgment notwithstanding the verdict properly issued for the defendants.

2. <u>Summary judgment</u>. a. <u>Standard</u>. We review a decision to grant summary judgment de novo, construing all facts in favor of Biewald as the nonmoving party. See <u>Miller</u> v. <u>Cotter</u>, 448 Mass. 671, 676 (2007). The defendants, as the moving parties, have the burden of establishing that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law. See <u>Drakopoulos</u> v. <u>U.S. Bank Nat'l Ass'n</u>, 465 Mass. 775, 777 (2013).

b. <u>Retaliation</u>. Biewald argues that the motion judge erred by granting summary judgment to the defendants on his claim (count II) that the defendants violated G. L. c. 149, § 148A, by retaliating against him after he had expressed concerns about payment for earned commissions. "Lacking any direct evidence of a retaliatory motive, [Biewald] had the

---

[7] Instead, Biewald merely notes that the jury obviously agreed with his interpretation. He further argues that the jury were entitled to construe the employment agreement against Seven Ten as the drafter. See <u>James B. Nutter & Co</u>. v. <u>Estate of Murphy</u>, 478 Mass. 664, 669 (2018). However, Biewald actually prepared the initial draft employment agreements, including the language that ended up forming the basis for section 3.4.

burden of establishing a prima facie case of retaliation, and, in the wake of the defendants' introduction of nonretaliatory reasons for the various actions taken, the burden of proving that the articulated nonretaliatory reasons were pretext." Mole v. University of Mass., 442 Mass. 582, 591 (2004).

To make out a prima facie case, Biewald "had to show that [he] engaged in protected conduct, that [he] suffered some adverse action, and that 'a causal connection existed between the protected conduct and the adverse action.'" Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 474 Mass. 382, 406 (2016), quoting Mole, 442 Mass. at 591-592. Even assuming that Biewald could satisfy the first two elements, however, he could not satisfy the third. Contrary to Biewald's assertions, a causal connection cannot be inferred in this case from the timing and sequence of events. Rather, the critical adverse action -- the October 9, 2009, notice of the upcoming termination of the employment contract that Biewald claimed gave him a right to vested commissions -- does not postdate any alleged protected activity.

Still, Biewald contends that, after he raised his concerns, the defendants went on to reduce his commission rate, eventually reduce his compensation to "salary only," and then terminated his employment altogether. Because these actions came after Biewald protested the loss of compensation, we apply the

familiar three-part test for determining whether his termination was for an improper motive. Verdrager, 474 Mass. at 406. We assume that the timing of the adverse action was sufficient to make out Biewald's prima facie case. See id. at 409 ("[T]emporal proximity . . . is one form of 'circumstantial evidence that . . . . can demonstrate' the required causal connection"). The defendants presented evidence in support of their claim that they took these actions only because they could not come to terms with Biewald on a new employment agreement. Biewald claims that this reason was pretextual, but as the judge aptly noted, the defendants were not required to retain Biewald, an at-will employee, indefinitely and on his terms. On this unique factual record, therefore, the defendants were entitled to summary judgment.

c. Good faith and fair dealing. Biewald further argues that his claim (count VII) for breach of the implied covenant of good faith and fair dealing should have survived summary judgment given his assertion that Seven Ten terminated the employment agreement to deprive him of commissions under the EMC contract. See Fortune v. National Cash Register Co., 373 Mass. 96, 104-105 (1977). Seven Ten, however, offered evidence of a legitimate business reason for terminating the employment agreement, namely, to satisfy the demands of the "angel" investor. Biewald, in turn, has not offered any evidence that

calls that explanation into question. Summary judgment was therefore proper on this count. See York v. Zurich Scudder Invs., Inc., 66 Mass. App. Ct. 610, 618 (2006) (whether termination was for good cause typically presents question of fact for jury, but not if it is undisputed that action was "reasonably related, in the employer's honest judgment, to the needs of [its] business" [quotation omitted]).

3. Costs. Finally, Biewald appeals from the trial judge's order awarding costs in the amount of $3,464.60 to the defendants, pursuant to Mass. R. Civ. P. 54 (e), as amended, 382 Mass. 829 (1981). The costs related to six depositions, at least four of which were of named parties, and two document subpoenas. While only one transcript may have been used at trial, and no documents may have been produced in response to the subpoenas, we see no basis for concluding that the award amounted to an abuse of discretion. See Scholz v. Delp, 473 Mass. 242, 254 (2015), cert. denied, 136 S. Ct. 2411 (2016).

Judgment affirmed.

Order awarding costs
   affirmed.