NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12325

JAMES B. NUTTER & COMPANY  vs.  ESTATE OF BARBARA A. MURPHY &
others[1] (and two consolidated cases[2]).


Suffolk.     October 2, 2017. - January 18, 2018.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher, &
Kafker, JJ.


Mortgage, Foreclosure.  Real Property, Mortgage.


Civil actions commenced in the Land Court Department on
October 27, 2015; January 28, 2016; and February 11, 2016,
respectively.

A motion for partial judgment on the pleadings was heard by
Robert B. Foster, J., and the cases were reported by him to the
Appeals Court.

The Supreme Judicial Court on its own initiative
transferred the cases from the Appeals Court.

_____

[1] Patrick F. Murphy, individually and as personal
representative of the estate of Barbara A. Murphy; Thomas E.
Murphy; John F. Murphy; Mary C. Murphy; Internal Revenue
Service, Technical Service Group; Massachusetts Department of
Revenue -- Estate Tax Unit; and Secretary of Housing and Urban
Development.

[2] James B. Nutter & Company vs. Estate of Mary B. Jamieson &
others; James B. Nutter & Company & another vs. David E. Sweeney
& others.

Daniel Bahls (Uri Strauss also present) for Brett Jamieson.
Effie Gikas Tchobanian for the plaintiff.
Elaine Benkoski, for Estate of Barbara A. Murphy & others, was present but did not argue.


GANTS, C.J.  In 2007 and 2008, three elderly homeowners obtained loans from James B. Nutter & Company (Nutter), secured by reverse mortgages on their homes.  A few years later, two of the borrowers died; the third took ill and could no longer live in her home.  Alleging default, Nutter now seeks to foreclose on the mortgages.  Rather than proceed directly to foreclosure, however, Nutter brought separate actions in the Land Court against each borrower or the executors of their estate,[3] seeking in each case a declaratory judgment allowing it to foreclose pursuant to the statutory power of sale.

Each of the reverse mortgages adhered to Nutter's standard form, which states in paragraph 20 that, in the event of default, "[l]ender may invoke the power of sale and any other remedies permitted by applicable law."  The issue we must resolve is whether this language in the reverse mortgage incorporates the statutory power of sale as set forth in G. L. c. 183, § 21, and allows Nutter to foreclose on the mortgaged

---

[3] While litigation was pending, the third borrower also died.  James B. Nutter & Company (Nutter) amended its complaint, naming the executors of her estate as defendants.

property in accordance with the requirements in § 21.  We hold that it does.

Background.  1.  Reverse mortgages.  For many retirees, one of the most reliable potential sources of income in later life is the accrued equity in their homes.  See Consumer Financial Protection Bureau, Issue Brief:  The costs and risks of using a reverse mortgage to delay collecting Social Security, at 8 (2017).  In order to secure cash for their living expenses, many retirees choose to borrow against their home equity.  Id. at 9.

One way for them to do so is through a home equity conversion mortgage, which is a unique kind of loan available to homeowners age sixty-two or older. See Consumer Financial Protection Bureau, Reverse Mortgages:  A Discussion Guide, at 1, 3 (2017).  These mortgages are commonly referred to as "reverse mortgages" because, instead of making payments to the lender, the borrower receives cash from the lender, either as a line of credit, in monthly payouts, or as a lump sum.  Id. at 3, 12. As in a traditional mortgage, a reverse mortgage is secured by the borrower's home.  Unlike a traditional mortgage, however, the loan does not become due until the borrower dies or no longer lives in the home; interest and fees are added to the loan balance over time and the entire balance is typically paid from the sale of the home.  Id. at 3, 7.

Another distinctive feature of a reverse mortgage is that typically it secures a nonrecourse loan, meaning that the borrower is not personally liable for repayment of the debt.  In other words, the lender must "look exclusively to the mortgaged property for repayment."  Summers v. Financial Freedom Acquisition LLC, 807 F.3d 351, 355 (1st Cir. 2015).[4]

2.  Nutter's actions for declaratory judgment.  Nutter uses a standard form for its reverse mortgages.  Paragraph 9 of this form states the grounds for acceleration of the debt.  It provides that Nutter can require immediate payment in full if, among other grounds, the borrower dies, or the mortgaged property is no longer the borrower's principal residence. Paragraph 10 provides that the borrower shall have no personal liability for repayment of the debt and that Nutter cannot obtain a deficiency judgment against the borrower in the event of foreclosure:  "Lender may enforce the debt only through sale of the Property."  Paragraph 20 outlines Nutter's remedies in the event of default.  It states, in relevant part:

---

[4] To give an example of one way a reverse mortgage works, suppose a sixty-two year old homeowner has recently retired and decides to take out a loan of $250,000, secured by a reverse mortgage on her home.  She receives the $250,000 as a lump sum, continues to live in her home, and makes no payments to the lender during her lifetime.  The entire $250,000 loan becomes due, along with the accrued interest and fees, when she dies. Her heirs, who have inherited the home, must now repay the loan -- which they can do by selling the home.  If they do not repay the loan, the lender's only option is to foreclose on the mortgage and sell the home.

"Foreclosure Procedure.  If Lender requires immediate payment in full under Paragraph 9, Lender may invoke the power of sale and any other remedies permitted by applicable law. . . .  At this sale Lender or another person may acquire the Property.  This is known as 'foreclosure and sale.'  In any lawsuit for foreclosure and sale, Lender will have the right to collect all costs allowed by law."

In these three actions, Nutter moved for partial judgment on the pleadings, seeking a judicial declaration that the language in paragraph 20 incorporates the statutory power of sale as defined in G. L. c. 183, § 21.  The judge granted Nutter's motions, concluding that Nutter's reverse mortgage incorporated the statutory power of sale by reference because the statutory power of sale is a "remed[y] permitted by applicable law."  The judge reported the three cases to the Appeals Court pursuant to Mass. R. Civ. P. 64 (a), as amended, 423 Mass. 1403 (1996), and we transferred them to this court on our own motion.

Discussion.  The interpretation of a contract is a question of law, which we review de novo.  See Balles v. Babcock Power, Inc., 476 Mass. 565, 571 (2017).  To determine whether Nutter's reverse mortgages incorporate the statutory power of sale, we must first examine the nature of the power of sale in Massachusetts.

1.  Power of sale.  Massachusetts is a nonjudicial foreclosure State, meaning that it "does not require a

[mortgagee] to obtain judicial authorization to foreclose on a mortgaged property."  U.S. Bank Nat'l Ass'n v. Ibanez, 458 Mass. 637, 645-646 (2011) (Ibanez).  Since at least the beginning of the nineteenth century, Massachusetts has allowed mortgagees to foreclose without a judicial proceeding pursuant to the "power of sale," if such power is granted in the mortgage itself.  See Eaton v. Federal Nat'l Mtge. Ass'n, 462 Mass. 569, 580 n.16 (2012).  The power of sale evolved in recognition of "the desire to have a more speedy process of foreclosing than was furnished by suit or entry."  Id. at 580 n.15, quoting A.L. Partridge, Deeds, Mortgages and Easements 201 (rev. ed. 1932).  It soon became "a very frequent provision in deeds of mortgage."  Id., quoting 1 F. Hilliard, Mortgages 119 (1856).

The Legislature has chosen to regulate the power of sale through a detailed statutory framework, set out in G. L. c. 244, §§ 11-17C.  See Eaton, 462 Mass. at 581.  Chief among these statutory provisions is G. L. c. 244, § 14, which provides that any foreclosure by power of sale will be ineffectual unless certain notice requirements are met.  See Eaton, supra at 581 & n.17; Ibanez, 458 Mass. at 647-648.

The power of sale also is limited by the requirements of G. L. c. 183, § 21, which was enacted in 1912 as part of "An Act to shorten the forms of deeds, mortgages and other instruments relating to real property."  St. 1912, c. 502.  See Pinti v.

Emigrant Mtge. Co., 472 Mass. 226, 235 (2015).  As the title of the act suggests, the purpose of § 21 was "to give the power of sale [a] 'statutory form to shorten the length of mortgage instruments.'"  Id., quoting Eaton, 462 Mass. at 580 n.16.  Accordingly, § 21 defines the "statutory power of sale" and provides that it "may be incorporated in any mortgage by reference."[5]

But the statutory power of sale is far more than a mere contractual shorthand; § 21 establishes affirmative requirements that a mortgagee must meet in order to foreclose by power of

_____

[5] General Laws c. 183, § 21, provides:

"The following 'power' shall be known as the 'Statutory Power of Sale', and may be incorporated in any mortgage by reference:

"(POWER.)

"But upon any default in the performance or observance of the foregoing or other condition, the mortgagee or his executors, administrators, successors or assigns may sell the mortgaged premises or such portion thereof as may remain subject to the mortgage in case of any partial release thereof, either as a whole or in parcels, together with all improvements that may be thereon, by public auction on or near the premises then subject to the mortgage, or, if more than one parcel is then subject thereto, on or near one of said parcels, or at such place as may be designated for that purpose in the mortgage, first complying with the terms of the mortgage and with the statutes relating to the foreclosure of mortgages by the exercise of a power of sale, and may convey the same by proper deed or deeds to the purchaser or purchasers absolutely and in fee simple; and such sale shall forever bar the mortgagor and all persons claiming under him from all right and interest in the mortgaged premises, whether at law or in equity."

sale.[6]  See Eaton, 462 Mass. at 571 ("A foreclosure sale conducted pursuant to a power of sale in a mortgage must comply with all applicable statutory provisions, including in particular G. L. c. 183, § 21 . . .").  Failure to strictly adhere to the requirements of § 21 renders a foreclosure sale void.  Ibanez, 458 Mass. at 646-647.

2.  Nutter's form reverse mortgage.  In order for a mortgagee to exercise the statutory power of sale, the mortgage must itself grant such a power.  See id. at 646.  We conclude, as several Land Court judges have concluded, that there are generally three methods of incorporating the statutory power of sale into a mortgage:  first, by incorporating the exact language defining the statutory power of sale in § 21 into the text of the mortgage; second, by referring to this definition, generally by use of the term "statutory power of sale"; or third, by including language in the mortgage defining a power substantially similar to that of the statutory power.  See, e.g., Norton v. Joseph, 17 Land Ct. Rptr. 40, 41 (2009), aff'd,

---

[6] The Legislature has made this clear in the design of its statutory framework, which integrates § 21 into its other provisions regulating the power of sale in G. L. c. 244, §§ 11-17C.  For example, G. L. c. 244, § 15, requires a mortgagee who forecloses by power of sale to record an affidavit showing that "the requirements of the power of sale and the law have been complied with;" such an affidavit serves as "conclusive evidence . . . that the sale complied with [G. L. c. 244] and [G. L. c. 183, § 21]" (emphasis added).  G. L. c. 244, § 15 (b), (c).

77 Mass. App. Ct. 1120 (2010), citing The Massachusetts Co. v. Midura, 3 Land Ct. Rptr. 138, 138 (1995).

We agree with the Land Court judge that Nutter's reverse mortgages do not incorporate the statutory power of sale under either the first or third method.  The mortgage does not recite the exact language of § 21.  Nor does it define a power "substantially similar" to the statutory power of sale.

The more difficult question is whether paragraph 20 adequately refers to the statutory power of sale in § 21 by allowing the lender to "invoke the power of sale and any other remedies permitted by applicable law," even though it does not expressly use the term "statutory power of sale."  This is a matter of contract interpretation, to which we apply the traditional principles of contract law.

"[W]hen the language of a contract is clear, it alone determines the contract's meaning."  Balles, 476 Mass. at 571. Contractual language is ambiguous "if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one."  Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998).  When the language is ambiguous, it is construed against the drafter, "if the circumstances surrounding its use . . . do not indicate the intended meaning of the language."  Merrimack Valley Nat'l Bank v. Baird, 372 Mass. 721, 724 (1977).  "The author of the

ambiguous term is held to any reasonable interpretation attributed to that term which is relied on by the other party." Id.  Finally, we construe a contract as a whole, so as "to give reasonable effect to each of its provisions." J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 795 (1986).

These familiar principles are supplemented with more specific rules of construction where, as here, the contracts at issue are standardized contracts of adhesion.  Although typically when confronted with ambiguous language a court will examine extrinsic evidence to determine what the parties meant the contract to say, see Bank v. Thermo Elemental Inc., 451 Mass. 638, 648-649 (2008), such an inquiry is impracticable where the nondrafting party had no ability to influence the language of the contract.  See Restatement (Second) of Contracts § 211 comment c (1981) ("The customer [in a standardized agreement] . . . is commonly not represented in the drafting"). Thus, when interpreting adhesion contracts, we seek to effectuate, not the actual intentions of the parties in each transaction, but instead the meaning an objectively reasonable person in the nondrafting party's position would give to the language in the contract.  See, e.g., Golchin v. Liberty Mut. Ins. Co., 466 Mass. 156, 159-160 (2013) (standard insurance policies must be interpreted in light of "what an objectively reasonable insured . . . would expect to be covered" [citation

omitted]).  See also Restatement (Second) of Contracts, supra at § 211 comment e ("courts in construing and applying a standardized contract seek to effectuate the reasonable expectations of the average member of the public who accepts it").

Here, having considered both the language of paragraph 20 and the form reverse mortgage as a whole, we conclude that the mortgage is ambiguous as to whether it incorporates the statutory power of sale.  Paragraph 20 of the reverse mortgage states that the "[l]ender may invoke the power of sale and any other remedies permitted by applicable law."  Because it omits the word "statutory," this language is ambiguous on its face as to whether it includes the statutory power of sale.  The inclusion of the phrase "and any other remedies permitted by applicable law" does not eliminate this ambiguity because it can reasonably be understood to exclude the statutory power of sale: the word "other" indicates that this language refers to remedies other than the power of sale, and under standard rules of grammar, the modifying phrase "permitted by applicable law" would apply only to the immediately preceding term -- that is, "any other remedies" -- and not to the term "power of sale." See, e.g., Russell v. Boston Wyman, Inc., 410 Mass. 1005, 1006 (1991) ("The 'rule of the last antecedent' holds that 'qualifying phrases are to be applied to the words or phrase

immediately preceding and are not to be construed as extending to others more remote'" [citation omitted]).

This ambiguity is only exacerbated by the surrounding language. See Balles, 476 Mass. at 572 ("To determine whether [contractual] language . . . is ambiguous, we look both to the contested language and to the text of the contract as a whole"). The reverse mortgage contains language that appears to contemplate judicial foreclosure rather than foreclosure by power of sale: paragraph 11 of the mortgage provides that the borrower's right of reinstatement "applies even after foreclosure proceedings are instituted" (emphasis added), and paragraph 20 states that "[i]n any lawsuit for foreclosure and sale, Lender will have the right to collect all costs allowed by law" (emphasis added). Such language is plainly inconsistent with the practices of a nonjudicial foreclosure State like ours.

In addition, the notice that Nutter is required to send to the borrower under paragraph 20 states, "Borrower has the right in any lawsuit for foreclosure and sale to argue that Borrower did keep promises and agreements . . . and to present any other defenses that Borrower may have" (emphasis added). In the past, we have found substantially similar language contained in a notice of default to be seriously misleading to borrowers. In Pinti, 472 Mass. at 241-242, we noted the significant risk of confusion that stemmed from such language, explaining:

"[I]n a nonjudicial foreclosure jurisdiction like Massachusetts, misstating . . . information in a way to suggest that a mortgagor with a defense does not need to initiate a lawsuit but may wait to respond to a foreclosure lawsuit filed by the mortgagee can have disastrous consequences for the mortgagor: if the mortgagor has a valid defense to the foreclosure sale going forward, but is not made aware that he or she must initiate an action in court against the mortgagee to raise that defense, the sale may well proceed and result in title passing to a bona fide purchaser without knowledge of the issue -- at which point . . . the mortgagor's right to redeem his or her home may well be lost." [7]

The cases on appeal here are distinguishable from Pinti, where the issue was whether the default notice complied with the requirements set out in the terms of the mortgage itself. See id. at 243. But we draw a broader lesson from Pinti, which is that in a nonjudicial foreclosure State like ours, generic standardized language that does not reflect that fact creates a needless risk of misunderstanding and confusion. Here, the facial ambiguity of the phrase "power of sale and any other remedies permitted by applicable law," combined with the repeated references to judicial foreclosure throughout the mortgage, renders the language in paragraph 20 "susceptible of more than one meaning." Citation Ins. Co., 426 Mass. at 381.

Because the language in paragraph 20 has more than one potential meaning and is in a contract of adhesion, we construe

---

[7] The language at issue in Pinti v. Emigrant Mtge. Co., 472 Mass. 226, 237 (2015), contained in a default notice, stated that the borrowers had "the right to assert in any lawsuit for foreclosure and sale the nonexistence of default or any other defense".

it against the party that drafted it -- here, Nutter -- and adopt the interpretation that an objectively reasonable borrower of reverse mortgages would give to the language in the contract. See Lechmere Tire & Sales Co. v. Burwick, 360 Mass. 718, 720-721 (1972) ("an 'adhesion' contract [is] to be construed strictly against [the party] in whose behalf it ha[s] been drafted"). See also Restatement (Second) of Contracts, supra at § 211 comment c ("standard terms . . . are construed against the draftsman").  We note that this analysis is necessary only because of Nutter's draftsmanship.  If the term "power of sale" was meant to refer to the statutory power of sale, Nutter could have avoided any ambiguity simply by adding the word "statutory."[8]  Having said that, the rule construing ambiguities against the drafter does not require us to adopt the interpretation claimed by the estates of the borrowers in these

---

[8] Nutter could have easily adopted the language in the standard form required by the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) for mortgages executed in Massachusetts, which not only provides that the mortgagee may invoke "the STATUTORY POWER OF SALE," but also requires notice informing the borrower of "the right to bring a court action to assert the nonexistence of a default or any other defense" (emphasis added).  Massachusetts--Single Family--Fannie Mae/Freddie Mac Uniform Instrument, Form 3022 (rev. 10/16).  In contrast to the standard form mortgages required in judicial foreclosure States, it does not contain any language suggesting that foreclosure requires a judicial proceeding.  Contrast with, e.g., New York--Single Family--Fannie Mae/Freddie Mac Uniform Instrument, Form 3033 (1/01) ("Lender may bring a lawsuit to . . . have the Property sold").

cases. "A prerequisite to the application of [that] rule is that the alternative interpretation placed upon the alleged ambiguity . . . be, under all circumstances, a reasonable and practical one" (citation omitted). Shea v. Bay State Gas Co., 383 Mass. 218, 225 (1981).

Even construing the ambiguous language against Nutter, we conclude that the only "reasonable and practical" interpretation of the mortgage is that it incorporates the statutory power of sale. Id. It matters that this is a contract for a reverse mortgage, rather than a traditional mortgage, where the borrower makes no monthly payments of principal or interest, where the lender cannot hold the borrower personally liable for the debt, and where the lender's only recourse on default is to obtain repayment through a foreclosure sale. Without a power of sale, the only way that a lender can recover the principal of the loan, not to mention interest and fees, is through foreclosure by entry -- a process that would take three years -- or foreclosure by action, "a method rarely used" in Massachusetts. Beaton v. Land Court, 367 Mass. 385, 393 (1975).[9] In these

---

[9] In a foreclosure by entry, a mortgagee who peaceably enters a property and remains for three years, after recording a certificate or memorandum of entry, can thereby foreclose the borrower's right of redemption. G. L. c. 244, §§ 1, 2. In a foreclosure by action, the mortgagee must sue to foreclose on the property, in accordance with the ordinary rules of procedure governing all actions. G. L. c. 244, §§ 3, 4. See Beaton v. Land Court, 367 Mass. 385, 393 (1975).

circumstances, no reasonable borrower in Massachusetts would expect that a lender would enter into a reverse mortgage without retaining a power of sale. See Starr v. Fordham, 420 Mass. 178, 192 (1995) ("a contract should be construed to give it effect as a rational business instrument" [citation omitted]).

Having concluded that the only "reasonable and practical" interpretation of this form reverse mortgage is that it grants a power of sale, that power of sale necessarily must be a statutory power of sale, because in Massachusetts there is no power of sale except the statutory power of sale. The power of sale -- that is, the power to foreclose without judicial authorization -- cannot be exercised in Massachusetts unless it conforms to the statutory requirements of § 21. The Legislature's carefully crafted statutory framework leaves no room for parties privately to agree on a purely contractual, unregulated power of sale.[10]

To read the term "power of sale" in paragraph 20 as referring to anything other than the statutory power of sale would therefore render the provision a nullity, leaving the

---

[10] Parties do remain free, of course, to include within a mortgage specific terms governing the exercise of the power of sale that add to the requirements of G. L. c. 183, § 21. This is specifically contemplated by § 21, which requires a foreclosure by power of sale to "comply[] with the terms of the mortgage" as well as the relevant statutes. See, e.g., Pinti, 472 Mass. at 243 (default notice violated condition precedent to exercise of power of sale contained in mortgage).

lender with no ability to obtain repayment through a power of sale.  See Ferri v. Powell-Ferri, 476 Mass. 651, 654-655 (2017) ("the court will prefer an interpretation 'which gives a reasonable, lawful and effective meaning to all manifestations of intention, rather than one which leaves a part of those manifestations unreasonable, unlawful or [of] no effect'" [citation omitted]).  "It is neither reasonable nor practical to interpret [a] clause as being meaningless."  Shea, 383 Mass. at 225.  We therefore conclude that no reasonable borrower in Massachusetts would understand that this power of sale would be anything other than a statutory power of sale.[11]

By interpreting Nutter's reverse mortgage to incorporate the statutory power of sale, we bring these mortgages fully within the regulatory ambit of the statutes and case law that govern foreclosures in Massachusetts.  Nutter may not foreclose unless it strictly complies with the requirements in § 21, which in turn requires strict compliance with all other statutes related to the exercise of the power of sale.  G. L. c. 183, § 21.  See Eaton, 462 Mass. at 579-580; Ibanez, 458 Mass. at 646-648.

---

[11] Such a reading would also present a contradiction with the phrase that follows the term "power of sale":  ". . . and any other remedies permitted by applicable law."  Presumably a mortgage that requires "other remedies" to be consistent with applicable law would not contemplate a power of sale that is not.

Conclusion.  For the reasons stated above, we conclude that the language of paragraph 20 of Nutter's reverse mortgages incorporates the statutory power of sale as defined in G. L. c. 183, § 21.  We therefore affirm the orders allowing Nutter's partial motion for judgment on the pleadings in each case.

Judgments affirmed.